Barclay Company, et al. [1] v. Commissioner. Barclay Co. v. Commissioner
Docket Nos. 94557-94561, 2964-62.
United States Tax Court
T.C. Memo 1964-279; 1964 Tax Ct. Memo LEXIS 59; 23 T.C.M. (CCH) 1695; T.C.M. (RIA) 64279; October 23, 1964
Lester H. Salter, 146 Westminister St., Providence, R.I., and James R. McGowan, for the petitioners. Frederick W. Griffin, for the respondent. SCOTT Memorandum Findings *61 of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1958, 1959, and 1960 as follows: Docket
No.
Petitioner
Year
Deficiency
94557
Barclay Company
1958
$81,296.62
1959
34,004.79
94558
Barclay Company
1960
37,395.15
94559
Sally Greene
1959
15,209.91
94560
Samuel and Ann
Jacobs
1959
1,289.39
94561
Estate of Louis I.
Solmonson
1959
11,401.28
2964-62
Arnold and Marcia
Isenberg
1959
317.91
Certain adjustments having been conceded, the issues remaining for decision are: (1) Whether Barclay Company is entitled to carry forward net operating losses sustained prior to 1958 to be applied against income earned in 1958, 1959, and 1960, and (2) Whether the individual petitioners received ordinary income from certain payments made to them by Barclay Company in 1959 purportedly in payment of purchased notes of that company. Findings of Fact Some of the facst are stipulated and are found accordingly. Barclay Company (hereinafter sometimes referred to as petitioner), a Rhode Island corporation organized in 1946, with its principal office at 95 Hartford Avenue, *62 Providence, Rhode Island, filed its Federal income tax returns for the years 1958, 1959, and 1960 with the district director of internal revenue, Providence, Rhode Island. At all times here material, it has been engaged in the business of manufacturing and selling costume jewelry. It employs the accrual method of accounting and files its returns on a calendar year basis. Its books and records have been kept in its regular course of business. Sally Greene, an individual residing in Cranston, Rhode Island, filed an individual Federal income tax return for the calendar year 1959 with the district director of internal revenue for the district of Rhode Island. Samuel and Ann Jacobs, husband and wife residing in Cranston, Rhode Island, filed a joint Federal income tax return for the calendar year 1959 with the district director of internal revenue for the district of Rhode Island. Louis I. and Irene Solmonson, who during 1959 were husband and wife residing in Cranston, Rhode Island, filed a joint Federal income tax return for the calendar year 1959 with the district director of internal revenue for the district of Rhode Island. Arnold and Marcia Isenberg, husband and wife residing *63 in Cranston, Rhode Island, filed a joint Federal income tax return for the calendar year 1959 with the district director of internal revenue for the district of Rhode Island. Alvin Rice (hereinafter sometimes referred to as Rice) was petitioner's sole stockholder for some time prior to March 12, 1958. Rice never received a dividend from petitioner. Petitioner's books and records, as of January 1, 1958, showed capital stock outstanding of $150,000 and notes payable to Rice of $40,217.51, representing advances used in petitioner's business operations. The notes payable balance was reduced on January 31, 1958 by the amount of the sales price of two automobiles purchased by Rice from petitioner for $3,670 and was further reduced in February 1958 by cash disbursements to Rice totaling $6,627.01. On February 28, 1958, petitioner issued a demand note payable to Rice in the amount of $29,920.50. There was no maturity date or provision for interest on the note. Petitioner's books and records, as of March 12, 1958, showed capital stock outstanding of $150,000 and notes payable to Rice of $99,920.50, which notes payable consisted of the $29,920.50 note plus a demand note having neither *64 maturity date nor interest provision, issued by petitioner on January 31, 1958 in the amount of $70,000. The $70,000 note evidenced the payment by Rice on January 31, 1958 of an obligation to the Industrial National Bank which Rice had signed jointly and severally with petitioner. Petitioner had been indebted to the Industrial National Bank for money borrowed to use in its business operations in amounts ranging between $50,000 and $88,000 since October 18, 1954. On March 12, 1958, Louis I. Solmonson (hereinafter sometimes referred to as Solmonson), acting for himself, his sister Sally Greene (hereinafter sometimes referred to as Sally), and Samuel Jacobs (hereinafter sometimes referred to as Jacobs), purchased all the outstanding capital stock of petitioner from Rice for $11,171.97. The stock was purchased in the following proportions. Percent of stock
Purchaser
purchased
Solmonson
45
Sally
45
Jacobs
10
At the time of the purchase of the stock of petitioner, Solmonson was the general manager of Sally's Creations, Inc., also known as Berkeley Company (hereinafter sometimes referred to as Creations), a principal competitor of petitioner. Sally and Solmonson *65 were the principal stockholders and officers of Creations. Jacobs was an employee and stockholder of Creations. The stock of Creations, as of March 12, 1958, was owned in the following proportions: Stockholder
Percent of stock owned
Solmonson
45
Sally
45
Jacobs
10 At one time Sally owned 66 2/3 percent and Solmonson 33 1/3 percent of the stock in Creations. Sally subsequently sold 10 percent of the stock of Creations to Jacobs and 11 2/3 percent to Solmonson. Also on March 12, 1958, Solmonson, acting for himself and others, purchased from Rice the two notes issued by petitioner to Rice in the aggregate amount of $99,920.50, for a price of $9,992.05. The notes, endorsed without recourse by Rice, were purchased as follows: Amount
Percentage of
Purchaser
Paid
amount paid
Solmonson
$4,271.60
42.75
Sally
4,271.60
42.75
Jacobs
949.25
9.50
Arnold Isenberg
299.76
3.00
Bernard Abedon
199.84
2.00
$9,992.05
100.00 Arnold Isenberg (hereinafter sometimes referred to as Isenberg) was the accountant, and Bernard Abedon (hereinafter sometimes referred to as Abedon) was the attorney, for Solmonson, Sally and Jacobs in connection with *66 the purchase of the stock and notes. Neither Isenberg nor Abedon has ever owned any stock in petitioner or in Creations. In 1959 petitioner paid the full face value of the notes to the purchasers as follows: Received from
Purchaser
petitioner
Solmonson
$42,716.00
Sally
42,716.00
Jacobs
9,492.50
Isenberg
2,997.60
Abedon
1,998.40
Total
$99,920.50
Petitioner's tax returns for 1954 through 1957 reported the following: 1954
1955
1956
1957
Gross sales
$513,433.64
$332,755.93
$218,518.50
$335,027.80
Gross profit
55,074.30
* (27,881.98)
(19,574.53)
(19,272.70)
Taxable income
(43,539.76)
(100,600.94)
(95,171.65)
(76,750.07)
Ending inventory
166,107.54
66,840.10
60,120.00
18,400.00
As of January 1, 1958, petitioner had a deficit in surplus of $205,530.21. On its 1958 return, petitioner reported taxable income, before carryover of pre-1958 net operating losses, of $166,916.58 and an unabsorbed deficit in accumulated earnings and profits, as of December 31, 1958, of $38,613.63. Respondent, in his notice of deficiency addressed to petitioner, made no change in its 1958 *67 return other than the complete disallowance of the claimed net operating loss deduction in the amount of $166,916.58. Costume jewelry, as manufactured by petitioner, and by Creations until 1958, is fashion-type jewelry, usually made of base metals with a gold or silver finish and ornamented with imitation pearls or stones. Because of the style factor, manufacturers generally create two sample lines a year for presentation to prospective buyers. The showings are held in May and November in Providence, Rhode Island, a principal area for the manufacture of costume jewelry. The manufacturer, or his representative, displays sample lines which are viewed by wholesalers and other prospective customers from all over the United States. Thereafter, the manufacturer produces the jewelry in quantities sufficient to fill orders, but generally not in excess of such quantities. Sally was employed as a sample maker, or designer, by Creations prior to March 12, 1958. She has since been employed in a similar capacity by petitioner. The sample line is created by the designer, who, making use of available parts, attempts to predict the fashion trend for the coming season. Ordinarily sample lines *68 are started 3 to 4 months in advance of the showings. In February 1958, Creations did not have a new line ready or in preparation for the coming May showing. Sally had been absent from Providence because of her husband's heart attack. Creations had concentrated throughout the preceding year on an item known as a "sweater guard," which had been fabricated in 1956 and had become so popular in 1957 that all of the time and effort of Creations' officers and employees had been devoted to sweater guard production. By January 1958, demand for the sweater guard had greatly diminished. During the period Creations had concentrated on the sweater guard, the rest of its items had become more or less obsolete. Prior lines produced by Creations were not the type which permitted re-use as the basis of a new line. Creations' management bought designs and molds from free-lance designers. The designs that were purchased were not practical from the standpoint of production. "Molds" are utilized in the production process to make castings which are a principal part of some items. "Tools," in the jewelry industry vernacular, are etched and cut out of steel by special craftsmen known as toolmakers, *69 and are employed on presses to make "findings," which are stampings used in some items of jewelry. Findings are usually purchased from specialists known as finding houses. Petitioner had operated at a profit from its formation in 1946 until the death of Louis C. Mark (hereinafter sometimes referred to as Mark) in 1954. Mark was a stockholder in and designer for petitioner until his death. He was a prominent jewelry designer, with a reputation for creating styles which could be manufactured without production complications. After Mark's death, Rice, who was residing in California at the time, moved to Providence and took over petitioner's management. New designs in petitioner's line were not well accepted by the trade after Mark's death, and petitioner's business began to decline. At the end of 1953, petitioner had accumulated earned surplus and undivided profits of $111,398.21. In the years 1954 through 1957, petitioner incurred net operating losses in amounts as heretofore set forth. In January 1958 Rice decided to sell petitioner and discussed the possibility with many people. At that time petitioner had on hand approximately 6,000 molds used in its past manufacturing *70 operations and available for future use. In early February 1958, Solmonson, whom Rice had previously met through customers, called Rice. Solmonson told Rice that he had heard that Rice wanted to sell out and made an appointment to visit petitioner's plant. After inspecting petitioner's plan, Solmonson expressed interest in buying various tools, molds, designs, and other items from petitioner. Rice stated that he would not sell piecemeal and that he would be interested only in selling the business as a business. Several days later Solmonson called Rice and asked if he could inspect the factory again with some other people. Rice gave his permission and Solmonson, with one or two others, thereafter spent several hours going through the various molds, tools, designs, machines, and other items in petitioner's plant. Solmonson then renewed his offer to buy certain assets. Rice replied that he was not interested in selling piecemeal. Subsequently there was another meeting between Solmonson and Rice at which Solmonson decided to buy Rice's stock. There was no price agreed upon at that time. A formula was set by which the price would be arrived at after accounting details were determined *71 by the parties' respective acountants. The formula generally provided for valuation of the assets and determination of the excess value of assets over liabilities. During the period of negotiation leading to the purchase of the stock in petitioner, Sally was in Florida with her husband, who was recuperating from a heart attack. She had almost daily telephone conversations with Solmonson. They did not discuss Federal tax implications of the proposed purchase, nor was there any mention of petitioner's net operating losses. Sally and Solmonson did not discuss the notes payable due Rice from petitioner. At the time the formula for the purchase of the stock was set, neither Solmonson nor any person representing him had access to the books and records or past tax returns of petitioner. Up to that time neither Solmonson nor any person connected with him inquired as to an accumulated or unused net operating loss of petitioner, and Rice did not furnish any such information. Rice had not discussed petitioner's financial problems and yearly losses with suppliers or others in the jewelry trade. On or about March 1, 1958, Isenberg, acting on Solmonson's instructions, and Samuel Gereboff, *72 an accountant who at that time did petitioner's accounting work, acting on instructions from Rice, met at petitioner's office to prepare from petitioner's records certain schedules of assets and liabilities needed for determining the price to be paid for the stock under the agreed formula. In examining petitioner's general ledger, Isenberg noticed a deficit balance which, Gereboff informed him, was incurred because of operating losses in prior years. Isenberg also notice the existence of petitioner's notes payable to Rice and saw petitioner's 1957 tax return. At that time, Isenberg requested that petitioner's prior returns be made available to him. The returns were turned over to him a week or 10 days after the stock was sold by Rice. Isenberg delivered the prepared schedules to Solmonson later the same day or the next day. He then informed Solmonson that petitioner had net operating losses from prior years which could be carried forward against petitioner's profits for 5 years. Isenberg also called the existence of petitioner's notes payable to Solmonson's attention. Solmonson indicated that as far as he was concerned, the notes were not to be taken into consideration in figuring *73 the selling price of the stock. There was no discussion between Rice and Solmonson through March 12, 1958, of any net operating loss of petitioner. Up to March 12, 1958, Abedon never discussed with Solmonson, Sally, Jacobs, Isenberg, or any other person acting for them, the tax consequences of the purchase of stock of petitioner. Up to the time Solmonson told Isenberg that he had agreed to buy Rice's stock, there was no conversation between them concerning petitioner's operating losses or any tax advantages that might be derived from the purchase. On March 12, 1958, Rice, his attorney, and Gereboff met with Solmonson, Abedon, and Isenberg at Abedon's office for the consummation of the sale of stock. Abedon, who had drawn up a sales agreement carrying out the formula previously set, presented it to the parties. After inspecting the proposed sales agreement, Rice's attorney told Rice that there was no provision for the payment of petitioner's notes payable to Rice. The parties differed as to whether payment for the notes was to be included in the agreement. After Rice refused to sell unless he was compensated for his two notes, Solmonson consented to pay 10 percent of the face *74 value. The sales agreement was redrafted while the parties waited, so as to read, in part, as follows: 1. * * * [Rice] agrees to sell and * * * [Solmonson] agrees to buy the following shares of stock for the amount as designated * * *
2. * * * [Rice] agrees to sell and * * * [Solmonson] agrees to buy (2) negotiable notes made by * * * [petitioner] to the order of * * * [Rice], which said notes total $99,920.50 and are divided as follows: note dated January 31, 1958
$ 70,000.00
note dated February 28, 1958
29,920.50
* * *
(a) * * * [Solmonson] agrees to pay * * * [Rice] ten (10%) per cent of the total amount of said notes which amounts to $9,992.05. * * *
3. * * * [Solmonson] agrees to pay all creditors and Accounts Payable as set forth in Exhibit B [which shows an aggregate amount of $37,428.45] * * * Petitioner's notes payable to Rice were not collectible immediately prior to the sale while petitioner continued in operation. If petitioner were liquidated, Rice would have received some payments on the notes. After the sale was consummated, Rice and his associates left Abedon's office. Isenberg then told Solmonson that, *75 in his opinion, if petitioner paid off the notes which had been purchased, any excess received over the cost would be treated as capital gain. Isenberg asked if he could purchase a percentage of the notes, and Solmonson assented to Isenberg's purchase of 3 percent. Abedon then purchased a 2-percent interest in the notes. Both Isenberg and Abedon were separately compensated for their services in connection with the purchase of petitioner's stock by Solmonson and his associates. Following the purchase of petitioner's stock by Solmonson and his associates, petitioner's operations were moved within the city of Providence into space leased by Creations approximately 1 1/2 to 2 miles from petitioner's original location. Petitioner paid Creations $600 a month for use of the space. Most of petitioner's machinery was sold because of duplication by newer machinery owned by Creations. Petitioner's fixtures actually attached to the real estate were sold in place prior to the move. Petitioner conducted its manufacturing operations with machinery owned by Creations for which petitioner paid $200 monthly rental. The manufacturing end of the jewelry industry is very seasonal in nature. Employment *76 reaches its greatest level in October, November and December, the height of the season. Employment then falls off and is at its lowest ebb during February and March. At the time of sale of its stock, petitioner had few employees. After March 12, 1958, many of Creations' employees were employed and paid by petitioner. While petitioner's move was occurring, Sally was making up a new line for petitioner from petitioner's old samples, molds, and models. During the period following March 12, 1958, unfinished business of petitioner required attention. Unfilled orders and merchandise in process were finished up. Repairs were made for customers, and jewelry company services were given to customers. At the May 1958 show, petitioner had a line, created by Sally, using only petitioner's materials, which was shown and offered to the trade by Creations. Creations ceased manufacturing operations after March 12, 1958, and did not offer a sample line of its own at the May 1958 show. Creations was used thereafter only as a sales organization for petitioner. After March 12, 1958, petitioner sold most of its jewelry to Creations for resale to wholesalers, throughout the United States. The *77 jewelry sold through Creations during 1958, 1959, and 1960 was manufactured by petitioner from its own molds, models and designs. Petitioner sold to approximately 500 accounts both prior and subsequent to March 12, 1958. Burntwood Products Company, Klik Creations, and George S. Carrington Company, three companies which had not been customers of petitioner, but had been customers of Creations, prior to March 12, 1958, became customers of petitioner subsequent to that date. The amounts of petitioner's sales to Creations and total sales, for the years 1958 through 1960, were as follows: Year
Sales to Creations
Total Sales
1958
$541,267.01
$ 805,692.17
1959
782,000.00
1,107,400.00
1960
776,930.61
1,292,564.00 Intercompany bookkeeping entries recorded the sales by petitioner to Creations. Creations paid petitioner regularly for the merchandise. For orders placed with petitioner in 1958, Creations received a 10 percent commission which was deducted on invoices to Creations in arriving at a net amount due. For 1959, Creations received an 18 1/2 percent commission, and in 1960 Creations received a 19 1/2 percent commission. The following represent bookkeeping *78 entries on the books of petitioner and Creations for sales made by petitioner to Creations: (a) August 31, 1958 sales invoice from petitioner to Creations for
merchandise sold through August 24, 1958
$177,346.81
Less 10 percent commission
17,734.68
Net amount due
$159,612.13
(b) Transaction recorded on petitioner's records
Account Receivable (Creations)
$159,612.13
Sales
$159,612.13
To record merchandise sold to * * * [Creations] as of
8/31/58
(c) Transaction recorded on Creations' records: Purchases
$159,612.13
Accounts Payable - * * * [petitioner]
$159,612.13
To record merchandise purchased to 8/31/58 from * * *
[petitioner]
Most of petitioner's sales prior to March 12, 1958, were to Barclay Jewelry, Inc. (hereinafter sometimes referred to as Jewelry), a separate corporation owned in the same proportions and by the same people who had owned petitioner prior to March 12, 1958, which resold petitioner's products to wholesalers throughout the United States. As of January 1, 1958, the tax return of Jewelry listed outstanding capital stock at a stated value of $7,500. Jewelry had a deficit in surplus of $8,563.69 at that time. On *79 March 12, 1958, Solmonson, Sally, and Jacobs paying $10 for all its outstanding capital stock, also bought Jewelry. Petitioner's total 1957 sales were $335,027.80, of which sales to Jewelry were approximately $275,000. Jewelry's purchases from petitioner amounted to approximately 83 percent of the price received for the jewelry when resold. The sales from petitioner to Jewelry were invoiced and recorded in the records of both companies in the same manner as sales by petitioner to Creations after March 12, 1958. Creations' tax returns for 1956 and 1957 reported the following: 1956
1957
Gross sales
$1,416,245.33
$1,832,516.89
Gross profit
405,112.75
528,571.54
Taxable income
31,432.89
101,829.51
Ending inventory
66,756.87
61,387.25
Salaries and wages
216,779.43
208,579.71
Salaries and wages
(not deducted else-
where)
29,833.91
91,650.80
Compensation of offi-
cers
53,400.00
73,400.00
Surplus
100,365.76
154,048.80
Creations' approximate percentages of gross profit and taxable income to gross sales for 1956 and 1957 were as follows: 1956
1957
Gross profit
28.6%
28.8%
Taxable income
2.2%
5.6%
Creations' *80 tax returns for 1958 through 1960 reported the following: 1958
1959
1960
Gross sales
$1,174,033.85
$961,617.38
$934,043.80
Gross profit
240,636.82
169,492.16
174,317.57
Taxable income
4,532.37
2,898.76
4,285.57
Ending inventory
0
0
0
Salaries and wages
76,746.29
0
0
Salaries and wages (not deducted elsewhere)
56,671.78
33,526.23
48,215.78
Compensation of officers
22,475.00
10,200.00
10,400.00
Surplus
157,221.42
157,829.87
150,343.63
In 1960 Creations distributed a $10,000 cash dividend to its stockholders. Creations' approximate percentages of gross profits and taxable income to gross sales for 1958 through 1960 were as follows: 1958
1959
1960
Gross profit
20.5 %
17.6 %
18.7 %
Taxable income
.039%
.030%
.046%
Creations' total net profit for 1956 and 1957 was $133,261.00; its total net profit for 1958 through 1960 was $11,715.00. The following reflect, in substance, entries appearing on petitioner's journal and on Creations' records: (a) August 31, 1958
Petitioner's journal: Purchases
$58,822.07
Accounts Payable
$58,822.07
To record purchase of inventory from [Crea-
tions]
Creations' records: Accounts Payable
$58,822.07
Purchases
$58,822.07
To record sale of merchandise, raw material,
and work-in-process
(b) December 31, 1959
Petitioner's journal: Sales
$33,656.32
Accounts receivable
$33,656.32
To increase [Creations'] commissions to 18-1/2
percent on [petitioner's] sales to [Creations]
Creations' records: Accounts payable
$33,656.32
Purchases
$33,656.32
To record credit to purchases to bring cost of
sales to 81 1/2 percent of total
(c) December 31, 1960
Petitioner's journal: Sales
$ 9,325.88
Accounts receivable
$ 9,325.88
To increase [Creations'] commissions to 19-1/2
percent on [petitioner's] sales to [Creations]
Creations' records: [A corresponding entry, similar to that of De-
cember 31, 1959, appears.]
*81 If the December 31, 1959, entries had not been made, Creations would have reported a $30,757 loss for 1959. If the December 31, 1960 entries had not been made, Creations would have reported a $5,040.31 loss for the year. Petitioner's tax returns for 1958 through 1960 reported the following: 1958
1959
1960
Gross sales
$805,692.17
$1,107,400.95
$1,292,564.12
Gross profit
239,658.76
189,465.63
262,961.27
Taxable income *
166,916.58
75,970.75
77,204.09
Ending inventory
58,426.70
84,630.89
78,362.75
Petitioner's approximate percentages of gross profits and taxable income to gross sales for 1958 through 1960 were as follows: 1958
1959
1960
Gross profit
29.7%
17.1%
20.3%
Taxable income
20.7%
6.9%
6.0%
Solmonson died on April 19, 1962.
In his deficiency notices directed to petitioner, respondent made no change in the amounts of net income prior to net operating loss deductions as reported by petitioner for the years 1958, 1959 and 1960, but determined that the net operating loss deductions claimed by petitioner for the years 1958 through *82 1960 were not allowable deductions in the computation of petitioner's income tax "under applicable provisions of section 269 of the Internal Revenue Code of 1954." In an Amendment to Answer, respondent alleged that "the net operating loss deductions claimed by petitioner for the taxable years * * * which were based on losses prior to the taxable year 1958, are not allowable by reason of sections 172 and 382(a) of the Internal Revenue Code of 1954." On their Federal income tax returns for the year 1959, Sally, Solmonson, Jacobs, and Isenberg reported as capital gains the amounts of $38,444.40, $38,444.40, $8,543.25, and $2,697.84, respectively, representing the differences in the payments to them on the notes purchased from Rice and their costs of such notes. In his deficiency notices addressed to Sally, Solmonson, and Jacobs, respondent determined that in 1959 they received dividends from petitioner's payments of its notes as follows: Amounts of dividend
Sally
$42,716.00
Solmonson
42,716.00
Jacobs
9,492.50
$94,924.50
In his deficiency notice addressed to Isenberg, respondent determined that in 1959 Isenberg *83 received ordinary income, rather than capital gain, in the amount of $2,697.84, from petitioner's payment of its notes. Ultimate Facts The principal purpose for which the acquisition of petitioner's stock was made was not the evasion or avoidance of Federal income tax by securing the benefit of a deduction which would not otherwise be enjoyed. Petitioner, after March 12, 1958, continued to carry on a trade or business substantially the same as that conducted prior to the change in its ownership. Petitioner as of January 1, 1959, had no accumulated earnings and profits. Current earnings and profits of petitioner in 1959 were $75,970.75, which is less than the aggregate amount of dividends attributed to Solmonson, Sally, and Jacobs in that year by respondent's deficiency notices. Opinion The first issue for decision is whether, under section 269(a) of the Internal Revenue Code of 1954, [2] tax avoidance or evasion was the "principal purpose" for the acquisition by Solmonson and his associates of petitioner's stock. This is a factual question. Frank Spingolo Warehouse Co., 37 T.C. 1 (1961); Elko Realty Co. v. Commissioner, 260 F. 2d 949 *84 (C.A. 3, 1958), affirming per curiam 29 T.C. 1012 (1958). Respondent's determination that "the principal purpose" for the acquisition of petitioner's stock was to secure a tax benefit not otherwise available is presumptively correct, with the burden on the petitioner to prove that such determination was erroneous. J. T. Slocomb Co., 38 T.C. 752, 765 (1962), affd. 334 F. 2d 269 (C.A. 2, 1964).
*85 A careful scrutiny of the record in the instant case discloses that "the principal purpose" of the Solmonson group in purchasing petitioner's stock was not the evasion or avoidance of Federal income tax, but rather a bona fide business purpose - the acquisition of petitioner's inventory of tools, molds, models, and other items so that Solmonson and his associates would have an acceptable line for the May jewelry show. The evidence shows, and we have so found, that Solmonson was not advised of petitioner's net operating losses during his negotiations with Rice at any time prior to an agreement between the two that the Solmonson group would buy petitioner's stock at a price to be determined on the basis of a formula for ascertaining the excess of the agreed value of petitioner's assets over the amount of its liabilities. The evidence further shows that although the accountant for the Solmonson group, on March 1, 1958, found out that there was a deficit in profits on petitioner's records and that petitioner had a net operating loss for the year 1957, neither he nor any other representative of the Solmonson group obtained copies of the tax returns for the years prior to 1957 until *86 approximately 10 days after the stock purchase took place. These facts were testified to both by parties interested in petitioner and by disinterested parties. Rice, who has had no financial interest in petitioner since the date he sold petitioner's stock to the Solmonson group, testified to these facts and his testimony was in part corroborated by the accountant for Rice who appeared at the trial as respondent's witness. The only testimony of a contrary purpose on the part of Solmonson in acquiring the stock on behalf of his group was that of the revenue agent who investigated petitioner's tax liability. This agent testified, after refreshing his recollection from notes he had made of a conversation with Solmonson around the first of April 1961, which notes were made approximately a month after the date of the conversation, that Solmonson had stated to him that he first became interested in the purchase of petitioner's stock because there was a net operating loss involved and for that reason he wanted to look at the molds and inventories, but that his primary reason for purchasing petitioner's stock was to obtain the molds, dies and inventory of the company. This witness could not *87 remember Solmonson's exact words and he took no notes of Solmonson's statements at the meeting. This agent testified that he had gone to see Solmonson to get him to state that the primary reason he was interested in purchasing petitioner's stock was because of a net operating loss, and that these were the words he had in mind getting Solmonson to state during the course of the interview. Petitioner's accountant who had attended the meeting between the revenue agent and Solmonson testified that at this meeting Solmonson had stated that his reason for buying petitioner's stock was to obtain the inventory, molds, and dies that he needed for use and that he did not know about the net operating loss when the negotiations started but found out about it at a later time and that he felt entitled to use this net operating loss and would use it if the petitioner could make money. To accept the agent's recollection of the statement that Solmonson made to him as accurately reflecting Solmonson's reason for initially becoming interested in the purchase of petitioner's stock would require that we either disregard entirely the testimony of Rice that he had not let it be known that petitioner *88 was sustaining net operating losses, that when Solmonson first approached him he wanted only to purchase the molds and dies and was not interested in purchasing petitioner's stock and that neither Solmonson nor any of his representatives was informed of petitioner's net operating losses until after the general terms of the sale had been concluded; or that we assume that Solmonson had some undisclosed means of discovering the existence of petitioner's net operating losses and went through the procedure of approaching Rice in an effort to buy the molds, dies, and inventory and of telling Sally that he was attempting to buy these assets as a planned cover-up for his real purpose. Rice's testimony is uncontradicted and is corroborated in many respects by Sally's testimony and in some respects by the testimony of Rice's accountant. Rice is not an interested witness and under these circumstances we are not justified, as respondent argues we should, in disregarding Rice's testimony. We do not believe that Solmonson attempted to buy only certain of petitioner's assets and told Sally, who was an equal owner of stock in Creations, that he was attempting to buy only those assets for Creations, *89 as a cover-up for his real motive in the acquistion but later when petitioner's tax liability was being investigated stated to the investigating agent that he first became interested in the purchase because of petitioner's operating losses. We, therefore, conclude that when the revenue agent wrote his notations approximately a month after his interview with Solmonson, his memory reflected as Solmonson's statement to him the statement he was attempting to obtain and not the real import of Solmonson's statement. Respondent argues that the fact that after the acquisition petitioner was not dissolved but was continued as an operating company, indicates that petitioner was acquired primarily for the purpose of tax avoidance by use of the net operating loss carryovers.The inference respondent makes from the failure to dissolve petitioner is unwarranted. The inference from the facts here established is that after ascertaining the existence of the net operating losses prior to acquisition of petitioner's stock and the amount of such losses subsequent thereto, the new stockholders decided that petitioner should not be liquidated but should continue in business so that if a profit could be *90 made, the tax advantage of the losses might be obtained. This inference does not indicate that the principal purpose of the Solmonson group in acquiring petitioner's stock was tax avoidance through use of net operating losses. It is not incumbent upon a taxpayer to arrange his affairs to produce the highest tax instead of to his own tax advantage. Respondent argues that the fact that three large accounts were shifted from Creations to petitioner supports his contention with respect to the primary purpose of the acquisition of petitioner's stock being tax avoidance. These accounts were three out of approximately five hundred customers of petitioner. Creations was selling for petitioner and the only difference this shift could have made was the sales commission on these orders. The fact that petitioner obtained three new customers who had previously been Creation's customers in no way supports an inference that the acquisition by the Solmonson group of petitioner's stock was for tax avoidance purposes. The facts of the instant case distinguish it from the cases relied upon by respondent *91 such as Thomas E. Snyder Sons Co., 34 T.C. 400 (1960) affd. 288 F. 2d 36 (C.A. 7, 1961), certiorari denied 368 U.S. 823 (1961), and J. G. Dudley Co., 36 T.C. 1122 (1961) affd. 298 F. 2d 750 (C.A. 4, 1962). In Thomas E. Snyder Sons Co., supra, the taxpayer, at the time its control was transferred, "was little more than a corporate shell with incurred losses" which had gone out of its original business of developing, manufacturing, and selling cornpickers. After the transfer of control, its business became the rental of tank cars and, a little later, the buying and selling of molasses, so that the business of the taxpayer which incurred the losses was entirely different from the business which produced the increase against which the losses were attempted to be offset. Moreover, the only testimony supporting that taxpayer's contention of a business purpose for the acquisition of its stock was that of the purchaser, which the Court found to be "without substance." In J. G. Dudley Co., supra, the taxpayer, at the time it was revived, had, for all practical purposes, left its original *92 business of manufacturing, selling, and shipping hosiery. Its total assets, which a year earlier had only consisted of $19.25 in cash, were gone. Its business was changed upon revival to electrical, heating, plumbing, contracting, and related types of work. Its sole stockholder was aware that its prior losses would be of use in reducing taxes. The business which incurred the losses was entirely different from the business which produced the increase against which the losses were attempted to be offset. Other cases in which "the principal purpose" of acquisition was found to be evasion or avoidance of Federal income tax are also distinguishable from the instant case. In Army Times Sales Co., 35 T.C. 688 (1961), when control of the taxpayer was transferred, the purchaser was fully aware that that taxpayer had insufficient financing and that the publication put out by it had gone downhill with a steady decline in advertising. Prior to and at the time of acquisition, that taxpayer was insolvent and on the verge of bankruptcy, and the purchaser was fully advised as to its net operating losses. Furthermore, the purchaser was interested solely in acquiring its stock and notes *93 as a "package deal" and never made any offer to acquire only its assets. After purchase, the business of that taxpayer was changed from publication and sales of one magazine to the sale of completely different magazines. In Frank Spingolo Warehouse Co., supra, the business of the taxpayer had been changed from the sale and installation of refrigerators, before transfer of control, to the trucking business. The Court did not find the testimony suggesting a business purpose for the acquisition convincing and found no other evidence indicating any business purpose for the acquisition. In Urban Redevelopment Corporation, 34 T.C. 845 (1960), affd. 294 F. 2d 328 (C.A. 4, 1961), the purchaser testified that his principal purpose was to acquire certain architectural plans and drawings, but he never made any attempt to purchase the plans and drawings, and he had never seen the plans and drawings before he consummated the deal. During the course of negotiations, the purchaser was advised of that taxpayer's net operating losses, including the amount and the years in which sustained. Also distinguishable on their facts are Zanesville Investment Co., 38 T.C. 406 (1962), *94 reversed - F.2d - (C.A. 6, 1964); Brown Dynalube Company v. Commissioner, 297 F. 2d 915 (C.A. 4, 1962); affirming a Memorandum Opinion of this Court; and F. C. Publication Liquidating Corp. v. Commissioner, 304 F. 2d 779 (C.A. 2, 1962), affirming 36 T.C. 836 (1961). In all of the aforementioned cases, "the principal purpose" of acquisition was clearly not a bona fide business purpose, whereas in our case petitioner has shown a bona fide business purpose as "the principal purpose" for acquisition of its control. See also Naeter Brothers Publishing Co., 42 T.C. 1 (1964). The present case is similar to Baton Rouge Supply Co., 36 T.C. 1 (1961). In that case, as here, the owner of the acquired corporation refused to sell its assets without selling the whole corporation, and the purchasers, who very much wanted the assets, found it necessary to buy the entire corporation. A part of the business of another corporation owned by the purchasers of the taxpayer corporation there involved was transferred to that taxpayer corporation, but such transfer was held not to put the taxpayer into a new business. The Court thus found, *95 at pages 13 and 14 that: * * * The evidence in this case affirmatively establishes that the acquisition of the stock of petitioner was for a bona fide business purpose. * * * [Purchasers] had a constant need to acquire more land to satisfy the requirements of their expanding business interests. * * *
We hold that * * * [the purchasers] acquired the stock of petitioner for a bona fide business purpose and not for the interdicted purposes set out in section 269. That Solmonson was told of and perhaps considered petitioner's net operating losses before March 12, 1958, does not, as respondent argues, indicate that his "principal purpose" for acquisition was tax benefit. He had decided to purchase petitioner before the date on which he learned of petitioner's net operating losses and had set up the purchase formula with Rice prior to learning of such losses. If after that point he considered the tax aspects of the purchase, this was no more than "ordinary business prudence." Berland's Inc. of South Bend, 16 T.C. 182, 188 (1951). As stated in Seminole Flavor Co., 4 T.C. 1215, 1231 (1945), "taxes occupy a prominent place in the operation of any *96 business." See also Baton Rouge Supply Co., supra, and Frederick Steel Co., 42 T.C. 13 (1964), on appeal (C.A. 6, Aug. 19, 1964). Tax evasion or avoidance becomes "the principal purpose" only when it exceeds in importance any other purpose. Commodores Point Terminal Corporation, 11 T.C. 411, 419 (1948), and Hawaiian Trust Company, Ltd. v. United States, 291 F. 2d 761 (C.A. 9, 1961). The acquisition of petitioner "was for a bona fide business purpose and not principally for the interdicted purpose mentioned" in section 269(a). Virginia Metal Products, Inc., 33 T.C. 788, 798 (1960), modified on another issue, 290 F. 2d 675 (C.A. 3, 1961). Petitioner is not automatically entitled to the carryover because the provisions of section 269 are inapplicable. There are other sections of the Code which provide for disallowance of a loss carryover, one of which is section 382. [3] As we stated in Fawn Fashions, Inc., 41 T.C. 205, 213 (1963): * * * *97 Section 382 disqualifies a net operating loss where three conditions are met: (1) An increase of at least 50-per-centage points in the stock ownership of a corporation by a prescribed number of persons within a taxable year beginning after June 22, 1954; (2) the increase in ownership is attributable to purchases of the stock; and (3) the corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the stock. * * * *98 Respondent amended his answer in the instant case to allege a change of business under the provisions of section 382(a) as a ground for disallowing the net operating loss carryover. Both parties recognize that respondent has the burden of proof on this issue. The burden of proof is of minor importance here since the facts affirmatively show that the first two requirements of section 382 have been met but the third has not. Even though all the stock of petitioner was purchased in 1958 by persons who prior thereto had owned no stock in petitioner, the provisions of section 382(a) "are applicable only if the loss corporation has not continued to carry on a trade or business substantially the same as that conducted before any increase in stock ownership * * *." Section 1.382(a)-1(h)(1), Income Tax Regulations. To determine whether such a change has occurred the consideration is not of purpose, motive, or intent, but is of the "facts as to its business operations." Goodwyn Crockery Co., 37 T.C. 355 (1961), affd. 315 F. 2d 110 (C.A. 6, *99 1963). Section 1.382(a)-1(h)(5), Income Tax Regulations, provides that among the relevant factors to be taken into account in determining whether a corporation has continued to carry on substantially the same business are "change in the corporation's employees, plant, equipment, product, location, customers, and other items which are significant in determining whether there is or is not a continuity of the same business enterprise." In the instant case it is stipulated that at all times here material, petitioner "has been engaged in the trade or business of manufacturing and selling costume jewelry." The absence of a shift in business suffices to distinguish cases disallowing net operating loss carryovers where there was a complete change in the type of business and products manufactured. Petitioner did not discontinue any portion of its business or make any changes in the type of product it manufactured. Petitioner was carrying on an active trade or business at the time of its change in stock ownership and continued to carry on an active business in the same products. The changes petitioner did make were in its employees, plant, equipment, location *100 and customers. These changes were of such little significance that were they considered a substantial change in business, the result would be to say in effect that the new owners could not put into effect improvements in operations so as to put the loss corporation on a profitable basis. Subsequent to the change in ownership of its stock, the location of petitioner's manufacturing facilities was moved to another plant approximately 1 1/2 to 2 miles from its prior location, but its manufacturing plant remained within the city of Providence, and it continued to manufacture and sell jewelry made from its own molds and models at its new location. See Goodwyn Crockery Co., supra, where we found that the taxpayer had continued to carry on substantially the same business even though it moved to two different cities and went into a second, entirely new line of business. At the time control of petitioner was transferred, the jewelry business was in its slack season. When business picked up, petitioner, in stead of hiring persons who had worked previously for it, hired persons who had worked for Creations. There is no evidence that any employee of petitioner's was fired or *101 laid off. Sally was hired by petitioner as a sample maker, but there is nothing in the evidence to show that anyone was laid off or fired to make room for her. It is to be expected that a corporation in the costume jewelry business, in order to shift yearly losses to yearly gains, would hire someone with the ability to design jewelry which would engender the necessary volume of sales. This is what petitioner did in hiring Sally. It is likewise to be expected that with a change in ownership there would be a change in top management. Petitioner sold its machinery because Creations owned newer machinery which it would rent to petitioner. A company intending to make a profit must be allowed to economize by replacing older machinery with newer, more efficient machinery. Petitioner's mold, designs, models, and other such items, which acquisition was "the principal purpose" for the transfer of petitioner's control, were kept and immediately utilized. Respondent's primary argument as to a change in petitioner's business is that it changed its customers. The evidence shows that petitioner added three new accounts which, out of a total of approximately 500, is insignificant. In Goodwyn Crockery Co., supra, *102 there was some change in the taxpayer's customers, and the taxpayer's prime customer, after the final move of its business location, was its purchaser and the purchaser's subsidiaries. Here, petitioner's immediate customers were wholesalers. It is true that its selling agent became Creations rather than Jewelry, but that does not change the fact that the nature of its selling arrangement was unchanged in that it still sold, through its selling agent, to wholesalers and ultimately to consumers. Cf. Kolker Bros., Inc., 35 T.C. 299 (1960). Creations was, in actuality, only a selling agent, not a customer. It did not buy from petitioner and then attempt to resell, but sold goods belonging to petitioner on a commission basis, buying from petitioner only after it had arranged for the resale of the goods. Even if the substitution of Creations for Jewelry as selling agent is viewed as a change in customers, this change alone is insufficient to be considered a substantial change in business. Here, as in Goodwyn Crockery Co., supra, taking all facts and circumstances into consideration, we hold that petitioner continued to carry on after the stock ownership change, *103 substantially the same business as prior to such change, and petitioner's use of its net operating loss carryovers is not limited by section 382. The final issue is whether the individual petitioners properly reported the payments to them in 1959 by the corporate petitioner as capital gains to the extent that the amounts received exceeded what they had paid for Rice's "notes." Petitioners take the position that the payments were received by them in retirement of corporate indebtednesses which were capital assets in their hands, and therefore the excess of the payments over the cost of the notes is capital gain within the provisions of section 1232(a)(1). [4]
*104 Respondent contends that the notes were not corporate indebtednesses since in substance they represented capital contributions by Rice to petitioner and not loans. Respondent further contends that the circumstances under which Sally, Solmonson, Jacobs, and Isenberg acquired the notes were such as to represent an additional equity investment in petitioner and not the purchase of a corporate indebtedness. We agree with both these contentions of respondent. The meager evidence respecting the issuance of the notes to Rice tends to show that he was making capital contributions to petitioner and took notes representing such contributions prior to the sale of the stock. Certainly there is insufficient evidence to establish a contrary inference and the burden is upon petitioner to show that the notes in fact represented "indebtedness" of petitioner to Rice. A sole shareholder may make a loan to his corporation, but it will be so considered for tax purposes only if the particular transaction is actually a loan and not in reality a capital contribution placed in the form of a loan. In determining *105 whether a transaction constitutes a loan or capital contribution, the substance and not the form of the transaction is controlling. Isidor Dobkin, 15 T.C. 31 (1950), affd. 192 F. 2d 392 (C.A. 2, 1951). Whether "notes" evidence bona fide indebtedness is to be decided upon the peculiar facts and circumstances of each case. Wilbur Security Co., 31 T.C. 938 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960); Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954). The $29,920.50 note was issued by petitioner to Rice on February 28, 1958, representing an accumulation of amounts advanced by Rice for use in petitioner's business operations. Although the note was on its face a demand note, there was no reference to interest to be paid thereon. There was no source, such as a sinking fund, set up from which payment of the note was to be made and in fact when the note was issued Rice had reached a tentative agreement for the sale of petitioner's stock. All these facts indicate that the $29,920.50 was not a bona fide indebtedness of petitioner to Rice. See R. E. Nelson 19 T.C. 575, 580 (1952); *106 Gokey Properties, Inc., 34 T.C. 829 (1960), affirmed per curiam 290 F. 2d 870 (C.A. 2, 1961); and Diamond Bros. Company v. Commissioner, 322 F. 2d 725 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court. The $70,000 note was issued on January 31, 1958, the very same day that Rice paid off a $70,000 obligation to the Industrial National Bank. As cosigner of the note with petitioner, when petitioner failed to pay the note, Rice became primarily liable for its payment. While under certain circumstances this might tend to show that the note was for a bona fide indebtedness, the other facts in the instant case call for a contrary inference. The loans to petitioner by the Industrial National Bank were used in petitioner's normal business operations. The evidence does not show the situation of petitioner at the time Rice first became a cosigner, but at the time Rice paid the $70,000 he knew there was little chance of his receiving any repayment unless liquidation of petitioner occurred, in which case he would have received "some" payment on the "note." There is no evidence in the record to show that at the time Rice became a cosigner he *107 was not likewise aware that there was little likelihood of his being repaid if it became necessary for him to pay the note. Such a voluntary incurring of a debt is considered to be a gratuitous contribution to capital. W. D. Roussel, 37 T.C. 235 (1961). We also agree with respondent's contention that Solmonson and his group did not in substance purchase "notes" from Rice, but made an additional equity investment in petitioner. Although the purchase price for the "notes payable" was separately stated in the contract, the substance of the transaction which took place was not a separate purchase of "notes" but was no more than the purchase of an additional equity interest in the corporation. Cf. Moughon v. Commissioner, 329 F. 2d 399 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court. Rice refused to sell the stock of petitioner unless Solmonson also bought the "notes." It is apparent that Rice wanted a certain amount for the sale of petitioner, and that Solmonson agreed to pay the amount demanded by Rice, so that the sale could be consummated. Thus, although a price for the "notes" was separately stated in the contract later drawn up, they were *108 not separately purchased, but were part of the total purchase price of Rice's equity in petitioner. See Jewell Ridge Coal Corp. v. Commissioner, 318 F. 2d 695, 698, 699 (C.A. 4, 1963), affirming a Memorandum Opinion of this Court. The "notes" having been purchased as part of the equity interest in petitioner, are in the nature of nonvoting stock redeemable at the "stockholder's" demand. When petitioner paid the notes, it was actually redeeming part of the equity investment of its stockholders. Both parties recognize that if we sustain respondent in his contention that the "notes" represented an equity interest in petitioner, the payments by petitioner to Sally, Solmonson, and Jacobs are dividends under section 316[5] to the extent that they were out of current or accumulated earnings and profits. Respondent contends that since petitioner was not entitled to use its loss carryover to reduce its taxable income, it is not entitled to consider a deficit existing prior to the change in stock ownership for the purpose of computing accumulated earnings and profits. Since we have held against respondent on his contention that petitioner is not entitled to its loss carryover *109 from years prior to 1958, there is no need to discuss this point. Except for this contention, respondent recognizes that petitioner *110 had no accumulated earnings and profits as of January 1, 1959, and both parties agree that petitioner's current earnings for 1959 are $75,970.75. As set forth in our findings of fact, in 1959 petitioner paid out a total of $99,920.50 to Solmonson, Sally, Jacobs, Isenberg, and Abedon. This payment was shown on petitioner's books as a payment to each of his proportionate interest in the "notes" purchased from Rice. Of this payment, 42.75 percent went to Solmonson and a similar percent to Sally and 9.50 percent went to Jacobs with 3 percent going to Isenberg and 2 percent to Abedon. Since we have held the "notes" to represent equity interests in the nature of stocks, and the payment by petitioner to be distribution to stockholders, it follows that to the extent of $75,970.75 the payment was from current earnings and the remaining $23,949.75 was from capital. Therefore, Solmonson and Sally each received a taxable dividend to the extent of 42.75 percent of the $75,970.75 of earnings of petitioner and Jacobs to the extent of 9.5 percent of the earnings with the balance of the payments to each of them representing a return of capital. It appears that the portion of the payment to each of *111 these individual petitioners which represents a return of capital exceeds the total amount paid by him for his stock in petitioner and the so-called "notes" which we have held in effect to be an equity interest. Therefore the basis of each of these individual petitioners in his stock in petitioner is reduced to zero. The amount paid to each of them in excess of the total of the portion we have held to be a dividend plus the amount paid for the stock and "notes" is taxable as capital gain. William D. P. Jarvis, 43 B.T.A. 439, 444, 445 (1941), affd. 123 F. 2d 742 (C.A. 4, 1941), and Shield Co., 2 T.C. 763 (1943). See also August Horrmann, 34 B.T.A. 1178, 1186, and 1187 (1936). The redemption of Isenberg's equity interest was the "complete redemption of all of the stock of the corporation owned by the shareholder." In accordance with section 302(a) and section 302(b)(3), [6] he is entitled to treat the redemption as a "distribution in * * * full payment in exchange for the stock." Therefore, the amount he has received in excess of his basis in the notes constitutes long-term capital gain since he had held his interest more than *112 6 months when it was redeemed. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Barclay Company, Docket No. 94558; Sally Greene, Docket No. 94559; Samuel and Ann Jacobs, Docket No. 94560; Estate of Louis I. Solmonson, Deceased, Irene Solmonson and Industrial National Bank of Rhode Island, Co-Executors, and Irene Solmonson, Individually, Docket No. 94561; and Arnold and Marcia Isenberg, Docket No. 2964-62.↩
*. Parenthesis denotes loss.↩
*. Before carry-forward of pre-1958 net operating losses.↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.↩
3. SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) Purchase of a Corporation and Change in Its Trade or Business. - (1) In general. - If, at the end of a taxable year of a corporation - (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at - (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to - (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.↩
4. SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).↩
5. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301↩ applies, such distribution shall be treated as a distribution of property for purposes of this subsection.
6. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK. (a) General Rule. - If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. (b) Redemptions Treated as Exchanges. - * * *
(3) Termination of shareholder's interest. - Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.↩