*Decision will be entered for the respondent.*

J. T. Slocomb Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 71430. Filed August 29, 1962.

*Boris Kostelanetz, Esq.*, for the petitioner.
*James E. Markham, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in income taxes for the taxable years 1954 and 1955 [1] against petitioner in the amounts of $17,746.23 and $68,185.18, respectively.

---

[1] All years referred to in this case, unless otherwise stated, relate to both calendar and taxable years.

The basic issue presented is whether petitioner has established by a preponderance of the evidence that the principal purpose of the acquisition of control of its stock was not the evasion or avoidance of Federal income tax on the part of the acquiring stockholders by securing the benefit of a deduction, credit, or other allowance which would not otherwise be enjoyed.

### FINDINGS OF FACT.

Some of the facts have been stipulated and, together with exhibits, are incorporated herein by reference.

Petitioner, J. T. Slocomb Company, hereinafter sometimes referred to as Slocomb, filed its income tax returns for the taxable years 1954 and 1955 with the district director of internal revenue at Hartford, Connecticut.

Petitioner's place of business is located at Mattson Hill Road, South Glastonbury, Connecticut. Petitioner was incorporated in Rhode Island in 1902.

For all taxable years in question petitioner was engaged, in part, in the manufacture, sale, and repair of micrometers. Petitioner has manufactured micrometers and center drills since 1891 and has a national and international reputation for the premium quality of its product. Petitioner is one of the four leaders in its field.

Petitioner's outstanding capitalization consisted of 100 shares of $100-par-value stock until December 29, 1939, when the company acquired 32 shares from W. B. McSkimmon, which stock was held as treasury stock. Prior to 1953, the capital stock of Slocomb was held as follows:

```
Donald McSkimmon_____ 50
W. B. McSkimmon_____ 18
Treasury _____ 32
```

In addition to the stock ownership, the stockholders had advanced substantial amounts of money on notes and open account, and as of December 10, 1953, said advances totaled $166,766.62.

Sales, net profits, and losses from operations for the years 1941 to 1953, inclusive, as reflected in petitioner's income tax returns, books and records, are as follows:

| Year | Sales | Net profit (loss) | Year | Sales | Net profit (loss) |
|---|---|---|---|---|---|
| 1941 | $906, 646. 00 | $162, 677. 75 | 1948 | $167, 017. 42 | ($50, 746. 57) |
| 1942 | 1, 571, 065. 55 | 274, 096. 10 | 1949 | 118, 258. 74 | (64, 871. 94) |
| 1943 | 1, 277, 080. 66 | 94, 274. 57 | 1950 | 146, 539. 17 | (59, 251. 59) |
| 1944 | 641, 699. 58 | (31, 016. 54) | 1951 | 276, 051. 23 | (81, 920. 55) |
| 1945 | 424, 294. 32 | (115, 963. 71) | 1952 | 205, 370. 83 | (131, 383. 17) |
| 1946 | 121, 129. 29 | (39, 896. 26) | 1953 | 143, 503. 71 | (59, 525. 46) |
| 1947 | 243, 783. 44 | (27, 388. 01) | | | |

In October 1952 Slocomb went into receivership, and the receivership petition included a plan for refinancing. By a decree of November 5, 1952, the plan for refinancing was approved, which provided for the continuance of the business and the procurement of a mortgage covering all assets in order to satisfy the claims of preferred creditors fully, and general creditors on the basis of 70 percent. Such a mortgage was placed with Albert Shore, d.b.a. Tremont Financing Co., in the principal amount of $142,000, and covered all the assets of the corporation. Pursuant to the plan of refinancing, the stockholders' claims were subordinated to the mortgage indebtedness by separate agreements.

On March 11, 1953, William B. McSkimmon died.

On October 30, 1953, an agreement was executed between Slocomb, Shore, d.b.a. Tremont Financing Co., and Aaron Krock & Co., Auctioneers, to sell assets of Slocomb and pay over sufficient proceeds to Shore to satisfy the obligation to Shore in full. For conducting said sale the auctioneers were to receive a commission of 5 percent on the proceeds realized from the sale of real estate, and a commission of 7½ percent on the proceeds realized from the sale of machinery, merchandise, and other assets.

No commissions were payable unless the proceeds from the sale were sufficient to satisfy fully the obligation to Tremont Financing Co. All sales were subject to the approval of Slocomb. The auction was held on November 19, 1953. All real estate and, with the exceptions mentioned hereinafter, machinery, machine tools, heat treating equipment, raw materials, finished goods inventory, and office equipment were sold to outside interests for $184,454.14, less certain inconsequential adjustments and credits.

Martin Chase, as agent for National Printing Company, a real estate company (hereinafter sometimes referred to as National), purchased the stock of the J. T. Slocomb Company which still owned its name and goodwill, if any. It also owned its forging dies, jigs, milling fixtures, casting patterns, customers' lists, part drawings, prints and tracings, consignment inventory, and cuts for catalog preparation for a total amount of $7,300, on which Krock received a 7½ percent commission, plus an amount equal to 70 percent (later determined to be $2,000) of the accounts receivable outstanding on the books of Slocomb, since they were assets of the corporation at the time of transfer of stock.

The value of the assets described above as owned by J. T. Slocomb Company, prior to the merger (other than trade name or goodwill) was approximately $25,000 to $30,000. Shortly after the stockholders of Green and Turbo acquired the stock of Slocomb, they received an

offer of $30,000 for the use of the name Slocomb in manufacturing center drills. The offer was not accepted.

To complete the sale of stock, Donald McSkimmon and the Estate of William B. McSkimmon agreed to carry out the following details:

1. Assign to Martin Chase or his nominee any and all claims of Donald McSkimmon against Slocomb;

2. Assign any and all claims of the Estate of William B. McSkimmon against Slocomb, and

3. Transfer the entire capital stock of Slocomb owned by Donald McSkimmon and the Estate of William B. McSkimmon to Chase or his nominee.

The closing of said transaction at which the said papers were executed was held on December 9, 1953. The stock certificate register shows that on December 9, 1953, Donald McSkimmon endorsed his 50 shares of stock to National. At said closing, National received delivery of stock certificate No. 5 (50 shares) in the name of Donald McSkimmon and stock certificate No. 6 (18 shares) in the name of the Estate of William B. McSkimmon.

On December 21, 1953, certificate No. 8 was issued to National for 68 shares of stock and on the same date certificate No. 5 (50 shares) originally issued to Donald McSkimmon was canceled along with certificate No. 6 (18 shares) originally issued to William B. McSkimmon. Also, on December 21, 1953, 6 of the 32 shares included in certificate No. 7 were transferred to Harley J. Brook, Trustee, as a stock dividend and the remaining 26 shares were retained as treasury stock.

On December 9, 1953, National entered into negotiations with Harley J. Brook, one of the stockholders of Green and Turbo, for the sale of the Slocomb stock.

Green Machine Company, Inc. (hereinafter referred to as Green), was organized under the laws of the State of Connecticut in May 1946, and engaged principally in manufacturing precision parts on subcontracts for Pratt & Whitney Co., Inc., a subsidiary of United Aircraft Company, specializing in aircraft engine parts.

Turbo Industries, Inc. (hereinafter called Turbo), was organized under the laws of the State of Connecticut in May 1951 to develop techniques which include highly specialized precision instrumentation such as probes and thermocouples for the aircraft industry. As in the case of Green, Turbo performed this work as a subcontractor on national defense contracts. One hundred percent of its gross income came from Pratt & Whitney Co., Inc., its only customer.

The accounts and notes remaining on the books of Slocomb due the McSkimmons were converted into a 5-year 6-percent debenture bond in the amount of $160,700 dated December 19, 1953.

In December 1953 the owners of the stock of Green and Turbo were as follows:

| Name | Green Machine Co. (par value $100) | Turbo Industries (par value $10) |
|---|---|---|
| | Shares | |
| Daniel Provan | 72 | 408 |
| A. William Gilwech | 45 | 255 |
| John Gregory | 72 | 408 |
| Harley J. Brook | 72 | 408 |
| Niles J. Brook | 72 | 408 |

Said stockholders, acting through Harley J. Brook as trustee, on or about December 21, 1953, purchased from National all of the outstanding stock of Slocomb as follows:

| Name | J. T. Slocomb Company shares (par value $100) |
|---|---|
| Daniel Provan | 16 |
| A. William Gilwech | 10 |
| John Gregory | 16 |
| Harley J. Brook | 16 |
| Niles J. Brook | 16 |

The price for the stock of Slocomb, together with the debenture bond, was $30,000.

The copy of "Transfer of Debenture" dated December 21, 1953, states, in part, that "Martin Chase, Treasurer of National, attests that National had, for value received, transferred to Brook the debenture bond of Slocomb dated December 19, 1953, in the principal amount of $160,700 and surrendered the debenture, bearing Registry No. 1 for cancellation and issuance of a new certificate to Harley J. Brook in the same amount."

The bond was exchanged for smaller denominations and was issued to the individuals in the amounts as follows:

| Name | Amount |
|---|---|
| E. John Gregory | $32, 800 |
| Niles Brook | 32, 800 |
| Harley J. Brook | 32, 800 |
| Daniel J. Provan | 32, 800 |
| A. William Gilwech | 20, 500 |
| A. S. Albrecht[1] | 9, 000 |
| Total | 160, 700 |

[1] Attorney at law, not a shareholder.

For several years, from August 1948 to December 1953 (when the stock of Slocomb was acquired) the stockholders of Green and Turbo had looked around for a product or manufacturing business, or both,

which would not be dependent on national defense contracts. They investigated, *inter alia*, the possibility of manufacturing by Green of a patented adjustable mirror, the production of a toy airplane, the development of a hair comb, and the fabrication of an eye-examining machine. They also had addressed numerous inquiries to an industrial publication regarding new products (such as insect killer, deodorizer, gas heaters, and an adjustable crescent wrench) for which a manufacturer was being sought; investigated the possible purchase of an electronic manufacturing business; the purchase of a soldering device business; and commenced development work on a thermocouple.

In 1953 shortly before the acquisition of petitioner's stock by the stockholders of Green and Turbo, said stockholders inquired into the possibility of acquiring Monocoupe Aircraft Corporation, Melbourne, Florida, and Wilcox Tool Company also located in Florida. In making their inquiries, the representatives of Green and Turbo sought information as to the tax status of possible acquisitions as so-called loss corporations. Both Monocoupe and Wilcox had accumulated substantial losses. Wilcox was in bankruptcy. Both were in the position of loss corporations.

On June 25, 1953, Niles Brook, one of the shareholders of Green and Turbo, wrote to "Harley, John, Dan & Bill" (other stockholders of Green and Turbo from Sarasota, Florida), in which he stated, in part, with respect to Wilcox Tool Company as follows:

To review the case I spoke of in personal bankruptcy, Sam said that this man had invested $20,000 in a business, went into bankruptcy with assets of $3000 and liabilities of $70,000. The $3000 was used to discharge the $70,000 under bankruptcy and *a ruling was obtained from Int. Rev. on how much loss could be established.* They ruled that the loss was only $17,000 and only out of the goodness of their hearts would they forget the $67,000 that should be treated as gain. *That doesn't look at all good as far as our chances of keeping the forgiven part of this deal as a loss is concerned.* You ought to have R. & R. look up this case. [Emphasis supplied.]

During this period Turbo requested a ruling from the Internal Revenue Service with respect to the postmerger availability of loss carryovers from a bankrupt corporation. The Internal Revenue Service declined to give Turbo a ruling on the inquiry.

After acquisition of Slocomb's stock and before merger with Green and Turbo, orders were placed with casting and spring suppliers, announcements of new management and advertisements were sent to dealers and sales agents; orders for repairs and micrometers were actively solicited; and research and development of new products and new adaptations of micrometric devices were carried on.

On January 22, 1954, a new pricelist was prepared for the trade. On January 29, 1954, Slocomb ordered 1,400 micrometer frames from Rhode Island Tool Company which had supplied the former manage-

ment. Also, work on Government contracts held by the old management of Slocomb was continued and completed.

After the merger, Slocomb completed the development of a device known as a "speedmike," a micrometer which allows the direct reading of measurements in arabic numerals rather than the interpolation of measurements from a line scale. Models had been produced under Slocomb's old management.

Also, a depth micrometer was developed which opened up the market for sales to users requiring exact measurement of declivities rather than outside diameters.

Machinery owned by petitioner prior to the aforesaid acquisition was antiquated. The drawings acquired were of little use.

The income tax returns of Green and Turbo for the period beginning May 1, 1953, and ending February 28, 1954, reflect subcontract expenditures of $30,638.91 and $2,560.65, respectively. Petitioner's returns for the taxable years 1954 and 1955 reflect subcontract expenses of $22,318.34 and $106,438.56, respectively.

The balance sheet of petitioner dated December 31, 1953, shows the following:

ASSETS

Current assets:

| | | |
|---|---|---|
| Cash in bank | $674. 99 | |
| Accounts receivable—Trade | 3, 927. 78 | |
| Inventory | 2, 446. 78 | |
| Total current assets | | $7, 049. 55 |

Other assets:

| | |
|---|---|
| Due from insurance company | 500. 25 |
| Total assets | 7, 549. 80 |

LIABILITIES AND NET WORTH

Current liabilities:

| | | |
|---|---|---|
| Accounts payable | | $1, 024. 80 |
| Long-term liabilities: | | |
| Notes payable | | 166, 766. 62 |
| Net worth: | | |
| Capital stock, par $100 issues, 100 shares | $10, 000. 00 | |
| Less: Treasury stock, 26 shares | 2, 600. 00 | |
| | 7, 400. 00 | |
| Paid-in surplus | 30, 000. 00 | |
| Deficit, Exh. D | (197, 641. 62) | |
| Net worth | | (160, 241. 62) |
| Total liabilities and net worth | | 7, 549. 80 |

An agreement of merger was made and entered into February 25, 1954, by petitioner, Green and Turbo, to become effective March 1, 1954, with petitioner the surviving corporation.

The merging of Green, Turbo, and the petitioner made necessary the transfer of Green and Turbo to Rhode Island and was accomplished by the dissolution of the Connecticut corporations and the chartering of two new corporations.

After the merger of Green and Turbo into Slocomb, micrometer manufacturing and repairing continued in the Micrometer Division of petitioner.

Except for Joseph Goodman, who had been sales manager of the premerged petitioner, the surviving corporation did not retain any of its engineering staff or production employees.

There was no outstanding diversification of work by either Green or Turbo before they were merged into petitioner or by petitioner after the merger outside of the diversification encompassed by the merger itself.

After the acquisition of Slocomb, an accounting firm was engaged to bring Slocomb's books up to date. The corporate balance sheets immediately preceding the merger reflected the following amounts of surplus or deficit:

| Corporation | Surplus (deficit) |
|---|---|
| Green | $44, 110. 40 |
| Turbo | 22, 336. 71 |
| Slocomb | (201, 270. 62) |

After the merger of Green and Turbo into Slocomb, the surplus of the resultant corporation reflected a deficit of $134,823.51.

Petitioner's income tax return filed March 12, 1954, reported a net loss of $59,525.46 in the year ended December 31, 1953.

Petitioner's income tax return for the year ended December 31, 1954, claimed "taxable income before net operating loss deduction" of $44,434.29, and a net operating loss deduction of $44,434.29, resulting in no income or loss for the year and no tax liability.

In a "Statement Relative to Net Operating Loss Carry Forward" attached to petitioner's 1954 income tax return, the following is claimed:

| Year of Loss | Amount | Available Through |
|---|---|---|
| 1949 | $64, 871. 94 | Not available. |
| 1950 | 59, 251. 59 | 1955. |
| 1951 | 81, 920. 65 | 1956. |
| 1952 | 131, 383. 17 | 1957. |
| 1953 | 59, 525. 46 | 1958. |
| | $332, 080. 87 | |
| Used in 1954 (from 1950) | 44, 434. 29 | ($14,817.30 balance to 1955.) |
| Available | $287, 646. 58 | |

The income tax return for the year ended December 31, 1955, claimed taxable income before net operating loss deduction and special deductions of $136,355.49, and a net operating loss deduction of $136,355.49. A schedule attached to the return claimed an unused loss carry forward available to years subsequent to 1955 in the amount of $151,291.09.

Petitioner is entitled to a net operating loss deduction in 1955 in the amount of $45,418.36 representing a net operating loss carryback from the year 1957.

An analysis of the sales records of the corporations involved for the years indicated is as follows:

| Year | From subcontracting | | From micrometers and repairs |
|---|---|---|---|
| | Turbo | Green | Slocomb |
| 1952 | $172,934.74 | $430,087.25 | $154,164.92 |
| 1953 | 237,369.69 | 450,120.65 | 116,323.98 |
| | (After merger) | | Micrometers and repairs |
| 1954 | $968,620.49 | | $41,396.04 |
| 1955 | 1,291,856.27 | | 73,307.29 |
| 1956 | 1,779,975.27 | | 77,899.97 |
| 1957 | 1,633,936.08 | | 90,595.96 |

In petitioner's tax returns for 1954 and 1955, deductions were claimed for interest on bonds (6-percent 5-year debenture bonds) in the amounts of $270 and $5,361, respectively. Said deductions were disallowed by respondent.

OPINION.

## I. *General.*

The significant issue revolves around the question of whether petitioner, J. T. Slocomb Company (a merged corporation), all of whose stock was acquired prior to merger by the shareholders of Green Machine Company, Inc., and Turbo Industries, Inc., and which merged with Green and Turbo shortly thereafter, may deduct for its calendar years ending December 31, 1954 and 1955, (a) net operating losses incurred by Slocomb prior to its merger with Green and Turbo, and (b) interest on debentures paid in said years by the merged corporations.

Respondent argues that section 269 of the Code of 1954 [2] is applicable, while petitioner takes the position that section 129 of the Code of 1939 (predecessor of section 269, *supra*) applies. We agree with respondent. Moreover, our conclusion would be the same under either section. Under the circumstances, we think further discussion of this preliminary issue is unnecessary. Our opinion will be directed to a consideration of section 269 to the extent here material. See also net operating loss provisions of section 172 of the 1954 Code. [3]

The amount of the loss and computation of carryovers are not contested by respondent.

The case turns upon the question of whether the principal purpose of acquisition of control of Slocomb was for business reasons, as contended by petitioner, or as contended by respondent, to evade or avoid Federal income tax by securing the benefit of a deduction, credit, or other allowance which the acquirers would not otherwise enjoy. Sec. 269. No question is raised as to acquisition or control. The focal point centers on "principal purpose."

## II. *Business Purpose.*

For several years the owners of Green and Turbo had made inquiries looking to the acquisition of a business which would diversify their activities. Green and Turbo were "captive" corporations in the sense that the source of substantially all of their business was with Pratt & Whitney Co., Inc., a subsidiary of United Aircraft Co. A change in business conditions might result in a sudden termination of this source of business, and the group did not want to carry all their eggs in one basket. At the same time, as a significant factor in making such inquiries, the Green and Turbo group kept a wide weather eye on opportunities for tax benefits including the medium of acquisition of loss corporations with substantial available carryovers.

---

[2] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

[3] SEC. 172. NET OPERATING LOSS DEDUCTION.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection.

When an attorney who had represented Green in various matters contacted the Green and Turbo group about the possible acquisition of Slocomb's stock, he advised them that there were substantial potential carryovers.

As a result of negotiations, the Green and Turbo stockholders paid $30,000 for the stock of Slocomb and the assignment to them of an indebtedness of Slocomb of $160,700 due to former stockholders. The indebtedness was converted into debenture bonds.

At the time the Green and Turbo group bought the stock of Slocomb, the latter's liabilities were substantially in excess of its assets. It was a moribund company which had an operating loss experience in 10 straight years immediately prior to the sale of its stock. Petitioner attributes this to bad management and management relations, but there is nothing in the record other than broad generalities to suggest any great likelihood of substantially reversing this trend.

Most of Slocomb's assets had recently been sold at auction through receivership proceedings. In the next several paragraphs, we will discuss the assets which it managed to retain, the benefit of which inured in corporate form to the purchasers of its stock.

Despite its record of 10 straight loss years, and assuming the bad management emphasized by petitioner, Slocomb appears to have kept its reputation for producing good products, and its name was favorably known even beyond the United States. Shortly after the purchase of its stock by the Green and Turbo group, an offer of $30,000 was received for the use of its name in manufacturing center drills. The offer was not accepted.

In addition to its name, Slocomb also owned forging dies, jigs, milling fixtures, casting patterns, customers' lists, part drawings, prints and tracings, consignment inventory, cuts for catalog preparation, and accounts receivable. There is testimony that these assets were worth more than $100,000. We cannot accept this as even substantially correct (although it would not affect our ultimate conclusion even if we did). The witness was obviously biased, and his testimony was vague, indefinite, and largely lacking in supporting facts. The assets in question obviously had some value, however, and, applying the principles of *Cohan* v. *Commissioner*, 39 F. 2d 540, especially in the light of the consideration actually paid for the stock, we attribute a value thereto of $25,000 to $30,000.

The debentures were, of course, assets to the purchasers, but liabilities of the corporation. Without repeating all of the facts relating to the condition of the corporation at the time its stock was acquired by Green and Turbo, we think it obvious that the debentures, obligations of a deficit corporation, had no significant value other than their potential use for tax avoidance in some one of the ways to be discussed *infra*.

It should be noted, however, that although the volume of sales was small compared to that attributable to the Green and Turbo activities, petitioner continued after the merger to manufacture micrometers and center drills, and also made some innovations and improvements in their product. There is nothing in the record to establish what part, if any, of the profits of the merged corporation are attributable to activities of the nature of those which had been carried on by Slocomb prior to the merger.

There is no evidence of any further diversification of activities after the merger.

### III. *Tax Avoidance Purpose.*

In discussing business purpose, we pointed out that, while the record supports the existence of such a purpose, it is also apparent that the record supports the existence of a tax-avoidance purpose. Manifestly, in cases of this character, it is hardly to be expected that there will be any direct evidence of intent to come within the statutory prohibition. The purpose can more readily be determined by a thorough evaluation of the entire record and the inferences to be drawn therefrom. S. Rept. No. 627, 78th Cong., 1st Sess., p. 59. As we stated recently in *Army Times Sales Co.*, 35 T.C. 688, 704 (1961):

> The judicial ascertainment of someone's subjective interest or purpose motivating actions on his part is frequently difficult. One method by which such ascertainment may be made is to consider what the immediate, proximate, and reasonably to be anticipated consequences of such actions are and to reason that the person who takes such actions intends to accomplish their consequences. This reasoning is implicit in the Latin maxim *acta exteriora indicant interiora secreta,* and in the more homely English adage "actions speak louder than words."

As will appear from our findings, Slocomb, at the time its stock was purchased by the Green and Turbo stockholders, and prior to the merger, had available net operating loss carryovers of $332,080.87. This represented a potential tax saving as of the time of the merger in the neighborhood of $160,000. We, of course, use the word "potential," because the actual benefit to be derived would depend to some extent upon developing circumstances. That there would be a substantial benefit appeared quite likely in view of the success of Green and Turbo. Moreover, the expected future profits from the conduct of that part of the business which had been operated by Slocomb prior to the merger were at least problematical.

Under all the circumstances, a tax avoidance purpose is clearly to be inferred. See *Army Times Sales Co., supra.*

As to the acquisition of the debentures by the stockholders of Green and Turbo, which was an integral part of the whole merger transaction, a tax-avoidance potential was apparent through the medium of

interest deductions and the benefit of allowance of capital gains treatment of the corporation's ultimate payments or distributions in redemption of the debenture bonds. *Army Times Sales Co., supra* at 705; *Brown Dynalube Company* v. *Commissioner*, 297 F. 2d 915, 918 (C.A. 4, 1962), affirming a Memorandum Opinion of this Court. The amount of potential tax savings through these media may likewise have proved to be substantial.

### IV. *Conclusion.*

It is apparent from the foregoing that there were two purposes of some significance in the acquisition of the Slocomb stock and the merger with Green and Turbo. One may be referred to as a business purpose, and the other as a tax-avoidance purpose. Both are significant. For petitioner to prevail, however, it must establish, by a preponderance of the evidence, that tax avoidance was not the principal purpose of the acquisition of control of Slocomb. This it has failed to do. Since no error on the part of respondent has been demonstrated, we must sustain his disallowance of the net loss carryovers and interest payments in issue.

In view of the above conclusions, there is no occasion to discuss the alternative contentions raised by respondent.

*Decision will be entered under Rule 50.*