Ellen W. S. Johnston v. Commissioner.
Johnston v. Commissioner
Docket No. 5605-66
United States Tax Court
T.C. Memo 1968-262; 1968 Tax Ct. Memo LEXIS 36; 27 T.C.M. (CCH) 1401; T.C.M. (RIA) 68262; November 19, 1968. Filed Chapman M. Belew, Jr., 610 Mercantile Trust Bldg., Baltimore, Md., for the petitioner. George K. Dunham, for the respondent. KERN Memorandum Findings of Fact and Opinion In a statutory notice of deficiency mailed July 8, 1966, respondent *37 determined deficiencies in petitioner's Federal gift tax for the years 1945 and 1964 in the respective amounts of $735.10 and $2,404.99, and for the year 1945 determined additions to tax for failing to file a return and for negligence in the respective amounts of $183.78 and $36.76. The determination of deficiency read as follows: In accordance with the provisions of existing internal revenue laws, notice is given that the determination of your gift tax liability for the 1945 and 1964 calendar years discloses deficiencies of $735.10 (plus delinquency penalty of $183.78 and negligence penalty of $36.76) and $2,404.99, respectively. The attached statement shows the computation of the deficiencies. The statement attached to the notice of deficiency referred to the delinquency penalty as having been added to the tax "in accordance with * * * section 6651(a) of the Internal Revenue Code" and to the negligence penalty as having been added "in accordance with the provisions of section 6653(a) of the Internal Revenue Code." In a motion to file amendment to answer respondent alleged that his use of the Code sections of Internal Revenue Code *38 of 1954 in the statement attached to the notice of deficiency was an inadvertent mechanical error and continued with the following allegations: The correct Code sections for the year involved, 1945, are section 3612(d)(1) of the Internal Revenue Code of 1939 for the delinquency penalty and section 1019(a) of the Internal Revenue Code of 1939 for the negligence penalty. The amendment to the answer will serve to correct a mechanical error in the statement attached to the statutory notice and does not affect the issues raised by the statutory notice and the pleadings. This motion being granted, respondent filed an amendment to answer containing the allegation "* * * that in addition to the deficiencies as before stated, the Commissioner has determined that additions to tax are due from petitioner for the year 1945 under the provisions of sections 3612(d)(1) and 1019(a) of the Internal Revenue Code of 1939, in the amounts of $183.78 and $36.76, respectively." The major issues remaining to be decided are: 1. (a) Whether petitioner made a taxable gift of an interest in real estate in 1945, and (b) if so, whether additions to gift tax should be made on account of delinquent filing *39 and of negligence, and 2. Whether a gift of securities in trust by petitioner in 1964 which, under designated circumstances, provided for the unlimited discretion on the part of the trustees as to amounts of income to be paid to the beneficiaries was the gift of a future interest so that the $3,000 exclusion for a gift of a present interest is not available to the petitioner. Findings of Fact Some of the facts herein were stipulated. We find those facts to be as stipulated and incorporate herein by this reference these stipulated facts and the exhibits attached thereto. Disposition of objections at trial by counsel to some of the stipulated facts and exhibits will appear in the exposition of the facts hereinafter found. The 1944-1945 Transactions Petitioner is an individual who resides at Burnside Farms (hereinafter referred to as "Burnside"), Stevenson, Maryland. She was born in Baltimore, Maryland in 1886 and has resided at Burnside all her life. Her gift tax return for the year 1964 was filed with the district director at Baltimore, Maryland. Burnside is located in the Green Spring Valley approximately eleven miles north of Baltimore. In 1944 Burnside contained approximately *40 500 acres of land and improvements, consisting of tenant houses, barns, dairies, corn houses, silos and two home places which were a short distance from each other. Petitioner and her husband lived in one home place and her mother, 1403 Ellen Ward Shoemaker, lived in the other. A large portion of Burnside was unimproved land, neither in close proximity to the home places nor likely to become income producing. The unimproved land was suitable for sale. Prior to 1944, the entire acreage of Burnside was owned by petitioner's mother. The property was put together by petitioner's grandparents and her father through a series of approximately sixteen acquisitions beginning in 1861. When petitioner's father died in 1933 petitioner's mother acquired Burnside by inheritance. The petitioner and her brother, Samuel Moor Shoemaker, were the only children of Ellen Ward Shoemaker. They had both grown up at Burnside. In 1944 and 1945 Samuel, an ordained minister, was rector of the Calvary Episcopal Church in New York City and he resided there with his wife at 61 Gramercy Park, North. Petitioner was the wife of Bartlett F. Johnston, who died in 1947. Samuel had two children while petitioner had *41 six, two of whom were living with her in 1944. Petitioner and her mother in 1944 managed that part of the Burnside property which was not rented to "Bart, Jr." (See Letter of H. B. Chapman to petitioner's mother, dated October 9, 1944, set out infra.) Petitioner supervised repairs and maintenance of the various farm properties, waterworks, roads and cottages. Although petitioner's mother was 82 years old at the time and physically not well, she was mentally alert and took care of the finances, collecting rents and paying bills. Petitioner's mother paid close attention to finances, consulted financial advisors, and was constantly making suggestions in regard to the operation of this property. Petitioner's brother, Samuel, took no part in the operation of Burnside. Samuel's ministerial duties did not allow him to return to Burnside during Christmas or other holidays but he did return in the summer and whenever he had vacations. Petitioner and her brother, their spouses, and petitioner's mother were a very closely knit family group. Petitioner's mother was very fond of the spouses of her children, and regarded her children and their spouses as a family unit. Sometime during 1944 *42 petitioner's mother gave serious thought to disposing of Burnside. She was advised to dispose of that property by Mr. R. B. Chapman, Vice President of Safe Deposit and Trust Co. (now through merger Mercantile-Safe Deposit and Trust Co.) of Baltimore in a letter addressed to her dated October 9, 1944. That letter read as follows: I have given "Burnside" a great deal of thought since our recent discussion, and the more I think of it the more I am inclined to recommend your immediate disposition of the property in order to relieve you of the heavy drain on your income caused by the fixed and large maintenance expenses, and the constant worry and annoyance of maintaining the improvements, the water works and drainage systems. As I have not had the detailed figures over the past four or five years, I do not know whether or not the rents from the cottages and the farm have resulted in a net profit to you, but from the information I have gathered from time to time in discussing it with you, Mrs. Johnston and Bart, I gather the impression that even after discontinuing operating the farm and renting it to Bart, Jr., the financial operation of the property has been a loss in view of the *43 necessity, each year, of expending large sums of money for the maintenance of the water works, roads, farm buildings, and cottages, and, in view of the age and nature of these items, there is no reason to believe that you will not always be faced with considerable expenditures on this score, with no possibility of any material increase in the revenue from the cottages and the farm. Thus, by disposing of the property immediately, you may benefit yourself financially and will be released from the burden of maintaining and caring for the property. By the same token, I would not recommend that you become involved in the sale, for development purposes, of such part of the property as is not required for your and your children's use. You would merely be jumping out of the frying pan into the fire, and this burden should be thrown on your children either by the outright gift of the entire property to them, with a reservation of your right to use the main dwelling and such part of the land surrounding it as you may require, so long as you live; or by establishing the value at this time, by accurate appraisals, and the gift to them of the purchase price. The reservation of your use of *44 the main dwelling, the manner in which the gift is to be made, and the gift and income taxes, are legal questions and should be submitted to counsel. As to counsel, you are represented generally, I understand, by Frank Murray and Mr. and Mrs. Johnston by Eben Cross. In view of the fact that Frank Murray is a member of the family, I 1404 strongly recommend that these questions be referred to Eben Cross, and if you will authorize me to do so, I shall be very glad to mention it to Mr. Cross and give him my views. As I understand it, the children are to assume all of the expenses of survey, title, etc. Counsel should consider the gift and income tax questions on your behalf, and our Tax Department will be very glad to work with him. The details as to surveys, engineering problems, appraisals and real estate development should be handled by Mrs. Johnston and Sam directly with the surveyors, engineer, appraisers, and real estate men. I enclose a copy of a letter I have today written Mrs. Johnston and Mr. Shoemaker, enumerating my thoughts along these lines. If you approve, particularly as to the employment of Mr. Cross, please sign the approval noted at the foot of the enclosed *45 copy of this letter and return it to me. On the same date Chapman wrote a letter to petitioner and her brother which read as follows: I enclose for each of you a copy of a letter I have today written your mother with reference to the disposition of "Burnside." I have the following thoughts and suggestions on the subject of surveys, engineering problems, etc. 1. Martinet should verify present lines, and adjust the same to the extent adjustments are necessary, and prepare new plats if required. He should also lay out the three separate tracts, one consisting of the main dwelling and land surrounding it to be conveyed to Mr. Shoemaker, subject to the reservation of your mother's use during her life; and, second, the tract to be conveyed to Bart, Jr. as part of Mrs. Johnston's share, subject to ample reservation with reference to the water works, drainage, etc.; and, third, the portion to be conveyed to Mrs. Johnston. 2. The engineering problems, such as roads and laying off the tracts to be reserved, as well as the development lots and possibly the reservations with reference to the water works should be submitted to an engineer, and while I have every confidence in the County *46 Engineer, inasmuch as he is interested in purchasing one of the development tracts, I suggest that you should have an outside engineer who would work with the County Engineer, and for this purpose I suggest the most likely man would be Mr. William Stevens, Offutt Building, Towson, Maryland, who was formerly with the Engineering Department of the Roland Park Company. 3. As to the real estate appraisers and operators, Mr. Harris has suggested the following, listed in alphabetical order and not in order of preference: William E. Hill, Jr. of Piper & Hill J. Kearsley Kearney William C. Pinkard Roland Park Company As indicated by my letter to your mother, such questions as the reservation of your mother's use, whether by lease or in the deeds themselves, whether to make a gift of the property itself, or a sale and a gift of the purchase price, gift tax and income tax problems, must be submitted to counsel, and I recommend Eben Cross, or someone of like ilk not in the family. Cross, who was petitioner's attorney, was retained by petitioner's mother in the fall of 1944, pursuant to the suggestion of Chapman. On October 16, 1944, the petitioner first contacted S. J. Martinet *47 & Co., a firm of registered professional engineers and land surveyors, in Baltimore. The order book of that Company indicates that on that date an order was received for a "Plat Subdivision * * * Burnside Farms * * *" from "Mrs. B. F. Johnston, Jr." [sic]. At that time the project of surveying Burnside was commenced. Four items in a work book maintained by S. J. Martinet & Co. identify the work on Burnside Farms by referring to Mrs. B. F. Johnston, Sr. and one item refers to a conference with "Mrs. Johnston & Mr. Shoemaker." The project was finally concluded on August 8, 1945 when the supervisor in charge had made his final check on boundary descriptions. Petitioner accompanied the surveyors during the field work, assisting them by showing boundary lines as she remembered them. In the late fall of 1944 attorney Cross obtained petitioner's father's will from Chapman. He then drafted a deed describing the farm simply as "* * * all of those lots and parcels of ground situate and lying in the Third Election District, Baltimore County, State of Maryland, which constitute the farm known as 'Burnside,' being all of the real estate given, devised and bequeathed unto [petitioner's mother] *48 by the FIRST ITEM of the Will of her late husband * * *." By the terms of the deed petitioner's mother conveyed the whole property to petitioner and her brother "as tenants in common and not as joint tenants." The deed was signed by petitioner's mother on 1405 December 27, 1944. Cross mailed the deed to the Baltimore County Clerk's office in Towson, Maryland. The deed was recorded on February 14, 1945, and the Clerk's office returned it to Cross at his request, on April 17, 1945. On that day, Cross sent the deed to Chapman at the Safe Deposit and Trust Co. Chapman returned the deed to Cross on April 20, 1945, enclosed in a letter reading as follows: I am in receipt of your letter of April 19, enclosing the Deed from Mrs. Shoemaker to her children, and have noted the place of record on my copy of the Deed, the original of which is returned herewith. I was under the impression that you would retain the Deed until the gift tax returns had been audited, and then deliver it to either Mrs. Johnston or Mr. Shoemaker, to be placed with the rest of the title papers for "Burnside." As soon as the lease has been returned from the Record Office, I should like to have the record reference *49 therefor also. A gift tax return was prepared by Cross and was signed by petitioner's mother as donor on March 13, 1945. It reported gifts of real estate to petitioner and her brother "[conveyed] by Donor to Donees under deed dated December 27, 1944." Attached to the return were two appraisals, one in the form of a letter addressed to petitioner stating that the appraisal was made at her request and one in the form of a letter addressed to Cross as attorney for petitioner stating that it had been made at the request of petitioner and her brother. On March 13, 1945 (the day she signed the gift tax return), [1] petitioner's mother also signed a lease agreement between herself as lessee and her children (petitioner and her brother) as lessors, wherein for a consideration of $1,200 per year payable in monthly installments of $100 per month she obtained a lease from her children of one of the houses on "Burnside" and some contiguous land for a period of six years beginning January 1, 1945. Also on that day, petitioner's mother executed a will, wherein she bequeathed the residue of her estate (after the payment of several small bequests) to two trusts, one for the benefit of petitioner *50 and one for Samuel during their respective lives with remainders to their respective descendants and, contingent on the deaths without surviving issue of petitioner and her brother prior to the deaths of petitioner's husband and Samuel's wife, with remainders to those parties until their deaths or remarriage. The gift tax return was timely filed on March 15, 1945. [2] Donee returns were filed by Cross on behalf of the children on or before April 15, 1945. The lease was finally signed by all parties on March 26, 1945 and recorded April 24, 1945. The Clerk's office returned it to petitioner's mother, petitioner and her brother soon afterward. On July 23, 1945, the petitioner and her *51 brother conferred with real estate appraiser J. Kearsley Kearney with regard to "the portions of 'Burnside Farm' which [they] had mutually agreed to retain as [their] respective individual interests." On July 31, 1945, Kearney wrote a letter to petitioner, the pertinent parts of which read as follows: Following the conference you and your brother Mr. Shoemaker had in my office on the 23rd, inst; relative to the portion of "Burnside Farm" which you had mutually agreed to retain as your respective individual interests, and your request for my estimate of the value of those respective interests I am addressing this letter to you with a copy which you may deliver to Mr. Shoemaker, if you will, as I do not know whether he is in Baltimore now or New York. * * * It is my understanding that you and your brother have elected to retain about fifty acres each out of the whole tract of "Burnside Farm." * * * Breaking down my original appraisal of the farm as of November 1944 and using the unit of land value applied to these respective areas plus the contributing value of the improvements on them would, as a matter of arithmetic result in the following: Mr. Shoemaker's portion would amount *52 to about $25,000 and your own to slightly over $30,000. This obviously, would be neither pratical or equitable. The portion of the farm elected to be retained by your brother insofar as land is concerned is, in my judgment part of the most valuable portion of the entire tract. While the main dwelling still 1406 presents its obsolete difficulties and will be minus the utility buildings usually found on a place of this size, the house occupied by Bart Jr. would have a very substantial independent value which would tend to offset some of the other disadvantages. I am of the opinion that this tract as indicated should have a sound value today of $35,000. Regarding the portion of the land which you have decided to retain I would not be inclined to increase the unit value beyond that which I placed on it in my original report because of its very limited main road frontage. In arranging your outline you have practically created a cul-de-sac, and if I were being critical on the side of equity I would suggest that you retain more road front on Park Heights Avenue for future developments. Analyzing the improvements on the portion you propose to retain, there were innumerable farm buildings *53 and tenant houses on the original farm appraisal that were undoubtedly unnecessary and thereby were reduced to a minimum value, certain to conceive those same improvements on a tract of fifty acres would from any practical point of view mean their obliteration as things of value. I have estimated that at least $11,500 of building value, based on the original report, should be written off. Some salvage will remain it is true but not without the expenditure of additional capital. By the same yardstick, however, there are five tenant houses, all under lease, on the portion to be retained by you, and while they represented an over-improvement on the entire farm as such, it is my judgment that their economic position will materially improve on a comparatively small area such as fifty acres, as they are located. The income from these tenant houses on their present lease basis is approximately $3,500 a year and while this may not continue to be a constant factor it will probably not vanish too far below this figure as some of them are rented today for less than their capacity. These five houses were set up in the original report as having a contributing value of only $6,250 and I think *54 that was substantially correct, on the other hand we are now dealing with fifty acres of an entirely different utility, and it would be foolish to assume that several of them might not be disposed of to much greater advantage without depreciating the remainder of the fifty acres. Likewise the house that you and Bart are now occupying would take on added worth because it is now more appropriate to the site it occupies. In attempting to answer your questions I have followed the line of least resistance and placed what I feel is a fair value on your brother's interest, that was comparatively simple. I have then tried to relate the value of your proposed holdings to his by comparison, possibly I have erred unconsciously on the part of compromise, however, if for sake of argument, $35,000 is a fair value for Mr. Shoemaker's portion of the farm, and I think it is, it seems to me you might break your own holdings down in somewhat the following manner: 50 acres of land at $150 per acre
$ 7,500.00
5 Tenant houses average $3,500
17,500.00
The house you occupy
5,000.00
Remaining improvements, sal- vage or otherwise
$35,000.00
I think you and your brother have done *55 a perfectly excellent job of division and I see no further need at any time in the future for either of you to require the services of so-called experts. A "Plat of Survey and Subdivision of 'Burnside'" prepared by S. J. Martinet & Co. under date of August 8, 1945, reflects the portions of Burnside referred to in Kearney's letter of July 31 as having been mutually agreed to by petitioner and her brother. Under date of August 3, 1945, four typewritten descriptions were prepared by S. J. Martinet & Co. entitled "Description of 'Burnside Farm,'" "Description of the Portion of 'Burnside Farm' to be conveyed to Mr. Samuel M. Shoemaker," "Description of the Portion of 'Burnside Farm' to be conveyed to Mrs. Bartlett F. Johnston, Sr.," and "Description of 'Burnside Farm' Exclusive of the Portions to be Conveyed to Samuel M. Shoemaker and Mrs. Bartlett F. Johnston, Sr." These descriptions conform to the "Plat of Survey and Subdivision." In early September, 1945, after the surveyors had completed their survey and furnished the deed descriptions, Eben Cross requested the Maryland Title Co. of Baltimore to prepare deeds covering the Burnside properties. The Title Company did so and returned *56 the deeds to Cross on September 21, 1945. On October 6, 1945, petitioner and Samuel Moor Shoemaker, joined by their spouses, conveyed Burnside Farms to Anne T. Kelly, a straw person (500.57 acres more or less). This conveyance was subject to the before mentioned lease dated December 27, 1944, between themselves and their mother. 1407 On October 6, 1945, Anne T. Kelly reconveyed Burnside in three deeds: (a) A deed of 53.66 acres to petitioner and Bartlett F. Johnston, her husband, as tenants by the entireties. (b) A deed of 55.21 acres to Samuel M. Shoemaker, petitioner's brother, and Helen Shoemaker, his wife, as tenants by the entireties. (c) A deed of approximately 391.7 acres to petitioner and her brother as tenants in common. The descriptions contained in these deeds were the same as those furnished by S. J. Martinet & Co. and the portions of Burnside covered by the deeds are in conformity with those referred to by Kearney in his letter of July 31, 1945. On October 6, 1945, the fair market value of the 53.66 acres deeded by Anne T. Kelly to petitioner and her husband as tenants by the entireties was $39,573.50. In determining the amount of the taxable gift in *57 1945 on account thereof in his notice of deficiency to petitioner dated July 8, 1966, respondent used a factor of.43880 based upon the age of petitioner (59) and the age of her husband (63) during 1945 and then applied this factor to the $39,573.50 fair market value. It is stipulated that this is the correct factor to be used if there was a gift from petitioner to her husband in 1945. On October 18, 1945, the Maryland Title Guarantee Co. forwarded to Eben Cross its statement in the amount of $79.90 covering conveyancing, recording and acknowledgment costs of the four deeds which were executed on October 6, 1945. The law firm of Smith and Cross of which he was a member charged this expense to Ellen Ward Shoemaker and not to her children. It was subsequently paid by the mother as were the attorney's fees, the surveying costs, and the appraisal fees incurred between October 9, 1944, when Chapman made his recommendation, and October 6, 1945, when the final deed was signed. Petitioner filed no gift tax return for the year 1945. She made gifts in 1948 and 1964 and in each of those instances she filed timely returns. The 1964 Trust On October 14, 1964, petitioner transferred securities *58 with a stipulated value of $151,109.13 to a trust. The trust provided for the payment of the income from the securities to petitioner's five children and their descendants during the term of the trust, which was to last 10 years and 6 months or until the death of the last of petitioner's descendants, whichever occurred first. Upon the termination of the trust, the accrued and unpaid income was to be paid to the beneficiaries and the principal was to be paid over to the grantor if she were then living or to her estate if she were not. There were three trustees appointed. Paragraph 1 of the trust instrument directed them as follows: (a) The Trustees from time to time, but no less frequently than annually, shall pay to or apply for the benefit of such of my children as may be living during the existence of the Trust Estate all of the net income therefrom, in such amounts, with no requirement whatever as to equality as among such children, as the Trustees in their sole judgment shall deem appropriate for the care, hospitalization, medical expenses, emergency expenses of any nature, and education, where applicable, of them and of their respective families. In exercising their discretion, *59 the Trustees shall take into consideration the other resources or sources of income of the beneficiary for whom such payment is considered, and any decision of the Trustees as to any amounts to be paid shall be final and binding upon all persons and subject to question by no one. It is clearly understood that this trust is established primarily for such of my children and their families as may most need the income, but this shall not be deemed to preclude the equal division of any surplus income so that annually all of the income from this trust is paid out by the Trustees among my children for their benefit and the benefit of their families. (b) Upon termination of the trust, any accrued or unpaid income shall be paid over, free of trust, to and among my then living children in such proportions as the Trustees shall deem appropriate, taking into account the needs of such persons. * * * Petitioner filed a gift tax return for the year 1964 in which she reported the gift of securities in trust. In computing the gift tax due, petitioner claimed a $3,000 annual exclusion. The value of the right to income on $151,109.13 for one year, computed at a hypothetical rate of 3 1/2% return *60 on capital, is in excess of $3,000. Opinion KERN, Judge: The first issue presented herein is whether petitioner made a taxable gift of an interest in real estate in 1945. 1408 Both parties agree that, under section 1000 of the Internal Revenue Code of 1939 as in effect in 1945, the act of one spouse in creating a joint tenancy or a tenancy by the entirety constitutes a gift to the other spouse. See, e. g., Lilly v. Smith, 96 F. 2d 341, certiorari denied 305 U.S. 604, rehearing denied 307 U.S. 651; J. C. Gutman, 41 B.T.A. 816. The principal question relating to this issue is whether, as respondent claims, a gift was made by petitioner to her husband in 1945 by reason of her creation of a joint tenancy in a part of Burnside or, as petitioner contends, the gift to petitioner's husband was made in substance, if not in form by petitioner's mother by a series of transactions starting in 1944 which should be considered as being in reality one transaction and during which petitioner acted with regard to some of the steps taken as her mother's agent. The passage of twenty-two years from the events in controversy to the trial *61 of this case has deprived this Court of the testimony of many persons who held key roles in the transactions, the tax consequences of which we are to decide and has naturally dimmed the recollection of petitioner. [3]
Fortunately the record herein contains a large number of contemporaneous documents relating to the transactions here involved from which we have made copious quotations in our findings. From these and other facts stipulated it is established to our satisfaction that petitioner's mother, then aged 82, decided in 1944 to dispose of the property known as "Burnside" because "even after discontinuing operating the farm and renting it, to Bart, Jr.," the maintenance of the rest of the property resulted in a drain on the mother's income and a "constant worry and annoyance;" that she agreed with her advisors that the property should be sold for development purposes; that she wished to reserve for herself during the balance of her life a home on the Burnside property and to provide homes *62 on the property for her two children; that she did not wish to be bothered with the problems incident to development and division; that she deeded the Burnside property to her son and daughter (the petitioner) as tenants in common with the intention that they would assume the ultimate responsibility for the surveying of the property, the allocation of homesites to each and the disposition of the remainder; and that petitioner and her brother, holding the property as tenants in common, came to an agreement as to the homesites each should have, and arranged for simultaneous conveyances of homesites to be made, one to petitioner and her husband as tenants by the entireties and one to petitioner's brother and his wife also as tenants by the entireties. Against this background petitioner's counsel argues that in substance, if not in form, the gift to petitioner's husband was made not by petitioner but by petitioner's mother and consequently petitioner is not liable for any gift tax on account thereof. As we understand this argument it is to the effect that all of the various transfers should be considered as several steps which should be synthesized into one whole transaction whereby *63 petitioner's mother in effect conveyed a tenancy by the entireties to petitioner and her husband. Petitioner contends that she held title intermediately as a tenant in common only nominally as a conduit and her conveyances were only as agent for her mother. Petitioner's counsel appears to feel that this argument is in some way substantiated by a contention that the deed of petitioner's mother to petitioner and her brother was not delivered to petitioner in 1944 [4] and that there was some condition that it was only to be effective upon the completion of "the surveys" until which completion there was a resulting trust created by the mother's deed. We note that "the surveys" were completed not later than August 8, 1945, and that the conveyances by petitioner and her brother to the straw party and by the straw party to petitioner and her husband were made on October 6, 1945. We also note the execution of the 1944 gift tax returns, the execution of the lease to petitioner's mother by petitioner and her brother, the contents of the will executed by petitioner's mother, the payment by petitioner's mother of certain fees and costs and the activities of petitioner and her brother with regard *64 to the Burnside property as disclosed by the record. It appears to us that any detailed discussion of the evidence herein is 1409 unnecessary since petitioner's failure to successfully bear the burden of proving the factual predicates of her argument is obvious. We have examined the cases cited by petitioner in connection with her argument on this issue and have concluded that they are factually distinguishable from the case before us. Among them are Estate of George W. Hall, 6 T.C. 933; Estate of Grace D. Sinclaire, 13 T.C. 742; Linwood A. Gagne, 16 T.C. 498; Minnie E. Deal, 29 T.C. 730; Homer H. Marshman, 31 T.C. 269; and United States v. Anderson, 132 F. 2d 98. Petitioner particularly stresses the case of Ethel K. Lesser, 26 T.C. 306. Despite the vehement assertion by petitioner's counsel that "[unless] there *65 is to be a double standard applied, the present case is controlled by the Court's decision" in the Lesser case, we are unable to conclude that petitioner has proved that the first of the transactions (the conveyance by petitioner's mother to petitioner and her brother) "was taken only with a view toward the last" (the conveyances by the straw party to petitioner and her husband and to petitioner's brother and his wife) and that each of the conveyances was made pursuant to a plan evolved prior to the first conveyance. Petitioner on brief presents another argument relating to this issue. Lest we should inadvertently weaken it by an attempted summary we set it out in toto as follows: In conclusion the Respondent's determination cannot be right even under this theory and this tends to emphasize the untenability of his position. The Respondent has taxed the Petitioner on the full $39,573.50 value of the homeplace which, under his theory, she transferred into a tenancy by the entirety. Of course the Petitioner never owned 100% of that homeplace because her brother owned an undivided one half interest. They were not reciprocal transfers either because the homeplace that the brother received *66 was worth only $20,634.75 according to evidence in the record (EX. 44). It is submitted that the only conclusion that the Court can draw is that the division was in accordance with a prearranged plan and that plan and creation of the tenancies by the entireties emanated from the Petitioner's mother. Exhibit 44 is a copy of a so-called thirty day letter dated April 7, 1966, and addressed by the district director to "Mr. Samuel M. Shoemaker, Jr. (Deceased)" proposing adjustments to his gift tax liability for 1945 in connection with a "gift of real estate of 'Burnside'" on the basis of the fair market value thereof being $20,634.75. The stipulation with regard to this exhibit is as follows: On or about April 7, 1966, the original of the attached document (Exhibit 44) was sent by revenue agent M. C. Kalichman to the estate of Samuel M. Shoemaker, Jr. The respondent has never assessed against the estate of Samuel M. Shoemaker, Jr. any gift tax for the year 1945, nor has the respondent ever mailed a statutory notice of deficiency with respect to such taxes to the estate of Samuel M. Shoemaker, Jr. or to any of its representatives. The copy of this document retained in respondent's files *67 is marked with the notation "void papers." Petitioner's argument quoted above ignores the letter of July 31, 1945, written to petitioner by the real estate appraiser Kearney, large parts of which are set out in our findings. In our opinion petitioner has failed to prove that the conveyances by the straw party to petitioner and her husband and to petitioner's brother and his wife "were not reciprocal transfers." Accordingly, petitioner's argument on this point is without validity. See Commissioner v. Warner, 127 F. 2d 913. A literal reading of the quotation from petitioner's brief set out above might indicate a contention on her part that the discrepancy between the valuations of the two properties (which has not been proved) points in some way to a conclusion that the "creation of the tenancies by the entireties emanated from the petitioner's mother." However, a reference to the opening statement of petitioner's counsel convinces us that this non sequitur is not intended. With regard to the additions to tax on account of negligence and failure to file a return, petitioner's entire argument on brief is as follows: Regardless of how the Court holds on the merits *68 there is no basis for assertion of penalties in this case. In the Committee Report enacting Section 2515 of the 1954 Code Congress clearly recognized that most taxpayers were not even aware that the creation by one spouse of a tenancy by the entirety under the 1939 Code constituted a taxable gift. Moreover, having applied 1954 Code penalties to alleged 1939 Code deficiencies in his notice of deficiency the burden of proof is on the Respondent. No reference was made to this issue in the opening statement of petitioner's counsel and no authority or evidence was adduced which directly bore on it. 1410 It is our opinion that the mistake made by respondent in the statement attached to the notice of deficiency with regard to the numbers of the sections of the Code under which the additions to tax for negligence and delinquent filing had been determined in the notice of deficiency itself was merely mechanical and did not result in any shifting of the burden of proof to respondent. See J. T. Slocomb Company v. Commissioner [64-2 USTC 9592], 334 F. 2d 269, affirming [Dec. 25,635] 38 T.C. 752. For the purposes of this case there is no material difference *69 between the substantive provisions of sections 1019(a)[5] and 3612(d)(1) [6] of the Internal Revenue Code of 1939 and the substantive provisions of sections 6653(a)[7] and 6651(a) [8] of the Internal Revenue Code of 1954. Since no proof, other than testimony adduced to unsuccessfully deny liability for the tax was offered for the purpose of showing the failure to file a return as being due to a reasonable cause and not to willful neglect, the fact that such a showing is limited by section 3612(d) of the 1939 Code to a situation where a return is filed after the required time and is not so limited by section 6651(a) of the 1954 Code is immaterial. *70 We conclude that petitioner has failed to prove that respondent erred in his determination stated in his notice of deficiency that petitioner was liable for a "delinquency penalty of $183.78" and a "negligence penalty of $36.76" in connection with her gift tax liability for 1945. The last issue herein presents the question of whether petitioner's gift to a trust in 1964 was a gift of a future interest and thus ineligible for the $3,000 exclusion provided by section 2503(b), Internal Revenue Code of 1954. [9]
*71 Respondent contends that, in the instant case, the broad and unappealable discretion vested in the trustees to apply the income to such of the beneficiaries as they determine are the most needy at the time of payment makes the payment to any one 1411 beneficiary during the year so uncertain as to render the gift one of a future interest. Petitioner urges that the $3,000 exemption should be allowed in the case of this trust because the broad discretion of the trustees in distributing the income is nevertheless controlled by a standard - for the "care, hospitalization, medical expenses, emergency expenses of any nature and education" of petitioner's children and their respective families. In our opinion the limitation of the trustees' absolute discretion in distributing the trust income among the children by reference to payments deemed by the trustees to be "appropriate for the care, hospitalization, medical expenses, emergency expenses of any nature, and education of them and of their respective families" [emphasis supplied] "as most need the income" is not such a standard as would make possible the valuation at the time of the gift of the income interest of any particular *72 beneficiary of the trust, and therefore, despite the socalled "standard" provided by the trust instrument, the question of whether petitioner's 1964 gift was a gift of a future interest falls within the ambit of Helvering v. Blair, 121 F. 2d 945, and Winston Paul, 46 B.T.A. 920. Petitioner also contends that, accepting the proposition that $151,109.13 at 3 1/2% can be expected to yield $5,288.82 in income in a one-year period, the income of the trust to be paid annually to a beneficiary or beneficiaries of the trust could not be less than $3,000 because all of the income of the trust must be paid out to a beneficiary or beneficiaries. The taxpayer in Winston Paul, supra, made the same argument which we found lacking in merit (p. 924). We adhere to this view. We conclude that no exclusion is allowable to petitioner under the provisions of section 2503(b) of the Internal Revenue Code of 1954. Decision will be entered for the respondent. Footnotes
1. It is stipulated that "On March 13, 1945, Ellen Ward Shoemaker executed three copies of a lease between herself and her children." However, the document identified in the stipulation as "A true certified copy" of this lease shows that it was signed and acknowledged before a Notary Public by all of the parties on December 27, 1944. ↩
2. On a later audit, petitioner's mother paid additional tax pursuant to an agreement between respondent and herself increasing the valuation of the Burnside property.↩
3. We do not mean by this to insinuate that petitioner's faculties had been impaired by age. At the trial herein she impressed us as being a bright, alert and very charming older lady.↩
4. The only testimony with regard to delivery was that of petitioner who, when asked whether the December 27th deed executed by her mother was ever delivered to her, testified as follows: "No, it was not. At least if it was, I don't know anything about it. I don't remember."↩
5. SEC. 1019. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 1021, relating to interest on deficiencies, shall not be applicable. ↩
6. SEC. 3612. RETURNS EXECUTED BY COMMISSIONER OR COLLECTOR. (d) Additions to Tax. - (1) Failure to File Return. - In case of any failure to make and file a return or list within the time prescribed by law, or prescribed by the Commissioner or the collector in pursuance of law, the Commissioner shall add to the tax 25 per centum of its amount, except that when a return is filed after such time and it is shown that the failure to file it was due to a reasonable cause and not to willful neglect, no such addition shall be made to the tax: Provided, That in the case of a failure to make and file a return required by law, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, if the last date so prescribed for filing the return is after August 30, 1935, then there shall be added to the tax, in lieu of such 25 per centum: 5 per centum if the failure is for not more than 30 days, with an additional 5 per centum for each additional 30 days or fraction thereof during which failure continues, not to exceed 25 per centum in the aggregate. ↩
7. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. ↩
8. SEC. 6651. FAILURE TO FILE TAX RETURN. (a) Addition to the Tax. - In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), of subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.↩
9. SEC. 2503. TAXABLE GIFTS. (b) Exclusions From Gifts. - In the case gifts (other than gifts of future interests in property) made to any person by the donor during the calendar year 1955 and subsequent calendar years, the first $3,000 of such gifts to such person shall not, for purposes of subsection (a), be included in the total amount of gifts made during such year. Where there has been a transfer to any person of a present interest in property, the possibility that such interest may be diminished by the exercise of power shall be disregarded in applying this subsection, if no part of such interest will at any time pass to any other person.↩